Wayne Thomas AHLERS and
Nina Ahlers, Plaintiffs,

v.

Ronald J. SCHEBIL, Mark Ptaszek, Jerry Clayton, Roy Mays, Ed Toth, and Ernie Milligan, Individually and in their Official Capacities as employees of the Washtenaw County Sheriff's Department, and Gary Parsons, Individually and in his Official Capacity as a Detective Sergeant for the Michigan State Police, Defendants.

No. 96–CV–73373–DT.

United States District Court,
E.D. Michigan,
Southern Division.

April 30, 1997.

Juan A. Mateo, Jr., Detroit, MI, for Plaintiffs.

Ian James Reach, Ann Arbor, MI, Mark E. Donnelly, Lansing, MI, for Defendants.

*OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING QUALIFIED IMMUNITY AND STATE TORT CLAIMS AND VACATING STAY OF DISCOVERY*

ROSEN, District Judge.

## I. *INTRODUCTION*

On July 25, 1996, Plaintiffs Wayne and Nina Ahlers filed a Complaint alleging that Defendants Ronald J. Schebil, Mark Ptaszek, Jerry Clayton, Roy Mays, Ed Toth, and Ernie Milligan, as officers with the Washtenaw County Sheriff's Department (the "Washtenaw County Defendants"), and Gary Parsons, as a Detective Sergeant for the Michigan State Police, violated Mr. Ahlers constitutional rights and committed various torts against him in the course of investigating him for sexually assaulting a prisoner while he was serving as an officer with the Washtenaw County Sheriff's Department. This matter is presently before the Court on the Washtenaw County Defendants' Motion for Summary Judgment regarding qualified immunity and the state tort claims. Having reviewed the parties' briefs and conducted a hearing on this matter, the Court is now prepared to rule. This Opinion and Order sets forth the Court's ruling.

## II. *FACTUAL BACKGROUND*

### A. *The Alleged Sexual Assault.*

On August 17, 1995, Ms. Carrie Ann Stiltner, a known prostitute and crack addict, (Plaintiffs' Response, Ex. D, Clayton Deposition, p. 55), arrived at the 14–B District Court with 8 other prisoners, whereupon she advised one of the transport officers, Larry Clemons, that she had performed oral sex on a male officer the night before in exchange for his promise to get her some food. (Defendants' Motion for Summary Judgment, Ex. A). Given the serious nature of this charge, Clemons promptly filed a report and alerted his superior, Det. Sgt. Roy Mays. (*Id.*). Later that same day, Mays and Officer Ed Toth interviewed Ms. Stiltner about the alleged incident. (Defendants' Ex. B).

In this taped interview, Stiltner described the following events. First, on the evening of August 16, 1995, Stiltner was arrested for prostitution and brought to the Washtenaw County Jail. (Defendants' Ex. A, p. 1 and Ex. B, p. 5). The officer who booked her that evening/early morning was Deputy Wayne Ahlers, the Plaintiff. Apparently, Stiltner knew Ahlers from an August 3, 1995 solicitation arrest where, during the booking process, Ahlers asked her several times, out of curiosity, how much she charged for her

acts of prostitution. (Defendants' Ex. B, p. 3). It was this incident that Stiltner claimed Ahlers was referring to when during her August 17, 1995 booking, he allegedly told her that they had "some unfinished business" and asked her if she remembered what they had talked about the last time. (*Id.* at pp. 3–4).

Next, Ahlers booked her, fingerprinted her, asked her some routine questions, and entered some booking information into a computer. (*Id.* at pp. 4–5). Thereafter, Ahlers asked her how much she charged for oral sex and implied that he used other prostitutes for oral sex. (*Id.* at p. 5). Subsequently, Stiltner was left alone in the holding cell. (*Id.*) However, Ahlers eventually entered the holding cell—either through the open door or because Stiltner opened the door—after he had knocked. (*Id.*); (*See also* Plaintiffs' Ex. D, Clayton Deposition, p. 92–94). Then, Stiltner repeated an earlier request for some food because she was hungry and Ahlers replied they had some "unfinished business." (Defendants' Ex. B, p. 6). Next, with the holding cell door open, Stiltner performed oral sex on Ahlers in the hope that she would get something to eat. (*Id.*). Stiltner claimed that because she had swallowed it, there was no physical evidence of this incident. (*Id.* at p. 9). Thereafter, Stiltner did not see Ahlers that evening and she never received the food that she had been promised. (*Id.* at p. 8).

## B. *The Washtenaw County Sheriff's Department Investigation of the Sexual Assault.*

While this interview with Stiltner was occurring, Sgt. Webber notified other key members of the Sheriff's Department of the alleged incident, including First Lieutenant Jerry Clayton. After Mays and Toth interviewed Stiltner, Clayton and Mays talked with Stiltner and she essentially repeated the same allegations. (Plaintiffs' Response, Ex. D, Clayton Deposition, p. 28–29). Later that evening, Clayton and Mays again talked with Stiltner. During this conversation, Stiltner's story remained the same, although she made it clear that the alleged assault occurred sometime after the booking process and prior

to the time that another female inmate, Felicia Lane, was put in the holding cell with her. (*Id.* at p. 32–33).

Next, Mays, Clayton, and Commander Mark Wusthoff decided to "put a wire" on Stiltner and isolate her so that they could obtain corroborating evidence from any contacts that she would have that evening with Ahlers when he came on duty at 11 PM. (*Id.* at p. 37). The wire was actually placed on Stiltner by a female officer, Acting Sgt. Andrea Adams. Next, Clayton gathered and examined a series of documents and records, including those produced during the booking process on August 16—August 17, to determine if Stiltner's story was possible. (*Id.* at p. 38). Apparently, these documents and records do not account for Ahlers' whereabouts between 12:30 AM and 1:00 AM, which was the period of time between Stiltner's and Lane's bookings. (Plaintiffs' Ex. F., Parsons Deposition, p. 40, 22–24).

As discussed above, the alleged incident occurred in the female holding cell which is located on the "female side" of the booking area. The booking area is approximately 30–40 feet long and 15–20 feet wide. (Plaintiffs' Ex. D, Clayton Deposition, p. 44). This area is particularly busy in the late evening and early morning, when the alleged incident occurred. (Defendants' Reply, Alvarez Affidavit, p. 3). Indeed, at any point in time, a member of the 7–person staff or various on-duty or visiting officers would enter the booking area to perform their duties or deliver, release, or take away prisoners. (Plaintiffs' Response, Ex. B, Johnson Deposition, p. 19–21). Moreover, the "male side" of the booking area and the male holding cell are monitored by video and audio monitors. (Defendants' Reply, Clayton Deposition, p. 60–63). The female side of the booking desk and the female holding cell, however, were not monitored by either audio or video at this time. (*Id.*). Because the female side, where the alleged incident occurred, was not monitored, Clayton and the other officers investigating this incident did not examine or preserve the audio or video tape from the evening/morning in question. (*Id.* at 62–63). In particular, Clayton explained that he did not look at this tape or preserve it or give it

to Parsons when he asked for such video or audio tapes because in his experience these tapes had not proved useful in determining what events had transpired on the female side. (*Id.* at 60–64). The investigating officers also did not interview Ahlers' immediate supervisor, Sgt. Donna Johnson, (*Id.* at 64–65), who, from her office off the booking area, can monitor these video and audio tapes and who was on duty during the evening/morning when the incident allegedly occurred, (Plaintiffs' Response, Ex. B, Johnson Deposition, p. 24). Additionally, the investigating officers did not interview Robert Alvarez, Ahlers' booking partner during the night/morning in question. (Defendants' Reply, Alvarez Deposition, pp. 4–5). According to Alvarez, he does not recall Ahlers leaving his side between 12:30 AM and 1:00 AM and he does not believe that such an incident could have occurred without someone seeing it due to the ebb and flow of people and officers passing through the booking area. (Plaintiffs' Ex. C, Alvarez Affidavit, p. 3).

The wire placed on Stiltner revealed that during the late evening of August 17, 1995 and the early morning of August 18, 1995, Ahlers did not attempt to make any contact with Stiltner. (Plaintiffs' Response, Ex. D, Clayton Deposition, pp. 49–51). The wire also revealed that when Stiltner called for Ahlers or asked to speak to him, he did not respond. (*Id.*). Although the record is not clear, it seems that at least some portions of the "wiring" were taped while Clayton, Mays, Adams, and Detective Grimm listened. (*Id.*).

At this time, because the Sheriff's Department "felt [Stiltner's charge] was a substantial enough charge and.. couldn't [be] verif[ied] . . ., [the investigating officers] felt [they should] turn [the investigation] over to somebody outside and let them do it." (Plaintiffs' Response, Ex. D, Clayton Deposition, p. 59). Apparently, it is the Department's policy to have a neutral, independent law enforcement agency investigate substantial criminal allegations made about its officers' conduct in order to avoid conflict of interest. (*Id.* at 58). Thus, on August 18, 1995, Clayton and Wusthoff decided to turn the investigation over to the Michigan State Police. (*Id.* at 58–60). From September 1,

1995 through February 13, 1996 (pre-charging/arraignment), Ahlers was suspended with pay, and from February 13, 1996 through March 28, 1996 (post-charging/arraignment), without pay. (Plaintiffs' Complaint, p. 4).

After August 18, 1995, the Washtenaw County Sheriff's Department was no longer involved in the criminal investigation of Ahlers. (*Id.* at 69). Clayton's only continuing involvement was as a liaison to the Michigan State Police—i.e., he provided the State Police with documents and records and assistance when they asked for it. This assistance included producing Felicia Lane's booking card and tapping Ahlers' home telephone in an unsuccessful attempt to obtain incriminating statements from an arranged telephone call from Stiltner. (*Id.* at 69–70, 88–89). Clayton also had responsibility for conducting an internal investigation regarding the Ahlers–Stiltner incident. (*Id.* at 70–74). However, the internal investigation was not initiated until after the criminal charges against Ahlers were dismissed on March 28, 1996. Thereafter, pursuant to the internal investigation, Clayton interviewed Ahlers about the incident on April 16, 1996. (*Id.* at 112). Subsequently, though, Commander Ptaszek relieved Clayton of this responsibility because Ahlers had apparently threatened Clayton. (*Id.* at 70, 75). As of February 1997, it appears that the Department has yet to conduct or is not going to conduct an internal investigation into the Ahlers–Stiltner incident, (*Id.* at 75–76), even though in its February 13, 1996 press release the Department stated that it would conduct an internal investigation of this matter since criminal charges had been filed, (Defendants' Ex.F, p. 1).

## C. *The "Social Security Number" Internal Investigation.*

The threats that Ahlers allegedly made about Clayton arise from the following incident. On April 29, 1996, Mr. William G. Elling, Jr. of Pinkerton Investigation Services wrote a letter to Lieutenant Mike Radzik of the Sheriff's Department regarding a series of contacts that he had had recently with Ahlers. (Defendants' Ex. D, p. 4). Specifically, Elling stated that in late Janu-

ary 1996 Ahlers telephoned him about employment opportunities. (*Id.*). Elling advised Ahlers that he would need to have a "C.C.W." (concealed weapons) permit. (*Id.*). In this regard, Elling was contacted in early February 1996 by Officer Kevin Bouse who told Elling that Ahlers needed a letter from Pinkerton regarding his employment in order to obtain the permit. (*Id.*).

A few days after Elling provided Bouse with this letter, Elling read an article in the Ypsilanti Press regarding the Prosecutor's decision to charge Ahlers with two counts of criminal sexual conduct arising from the incident with Stiltner. (*Id.; Defendants' Ex. F*). In response to this article, Elling called Bouse and told him that Pinkerton would not employ Ahlers in light of his indictment and he contacted the appropriate authority in order to disassociate himself with Ahlers' efforts to obtain a concealed weapons permit. (Defendants' Ex. D, p. 5).

Later that week, Ahlers called Elling and assured him that the indictment was insignificant and unfounded and that he would be able to get a permit shortly. (*Id.*). Moreover, Ahlers told Elling that Sgt. Ernie Milligan had arranged for Stiltner to call Ahlers at home to incriminate him and that, as a result, Ahlers was going to have Milligan fired and recover a substantial sum of money from the Department in a lawsuit. (*Id.*). In an affidavit, Sgt. Milligan, who is in charge of the Personnel and Human Resources Records Division, states that he has never been involved in any way with the Ahlers investigation. (Defendants' Ex. E, p. 2).

In early April, Ahlers telephoned Elling and asked him to "run social security numbers and get back current addresses on people." (*Id.*). Elling agreed and Ahlers gave him 5 social security numbers. (*Id.*). Upon running these numbers, Elling realized that all five people were current and/or previous officers with the Washtenaw County Sheriff's Department. (*Id.*). These individuals included: Milligan, Mays, Clayton, Clemons, and Adams. (*Id.*). When Elling asked Ahlers what he wanted with this information, Ahlers stated that he wanted Elling to "snoop around" on these people because they were crooked; were the subject of investiga-

tions by the Ann Arbor Police Department; and were people that he wanted revenge on, particularly Clayton, because they were not doing anything to clear his name. (*Id.*). Elling became concerned about Ahlers' conduct and subsequently contacted Lt. Radzik by letter and by phone in late April and detailed his recent contacts with Ahlers. (*Id.*).

Due to Elling's letter, on May 9, 1996, Commander Ptaszek assigned Lt. Robert J. Smith to investigate Ahlers' conduct. (Defendants' Ex. D., p. 1). On May 16, 1996, Smith met with Elling to clarify the statements he had made to Radzik. Elling stated that he believed Ahlers was seeking to ruin the personal and professional lives of the 5 people whose social security numbers Ahlers had given him. (*Id.*). From May 17 through June 3, 1996, Smith determined that the Ann Arbor Police Department was not investigating these 5 officers. (*Id.* at 2).

On June 4, 1996, Smith interviewed Bouse. (*Id.*). Bouse stated that he was the one who had contacted Elling about running the social security numbers, not Ahlers, and that because he was friends with both Ahlers and Elling, he had initiated these contacts because he was trying to help both of them out. (*Id.*). Later that same day, Smith met with Ahlers and his union representative, Harry Valentine. (*Id.*). In this interview, Ahlers stated that Bouse, and not him, had contacted Elling about running social security numbers. (*Id.*). On June 5, 1996, Smith spoke with Elling and Elling stated that he could not recall if it was Bouse or Ahlers who had inquired about the 5 officers. (*Id.* at 3). Later that day, Smith met with Commander Ptaszek and Under Sheriff Michael Johnson and they decided to close the internal investigation in light of Elling's apparent confusion. (*Id.*). Thereafter, Smith met with Ahlers and Valentine in order to counsel Ahlers about his anger toward the individuals involved with the Stiltner incident. (*Id.*). Ahlers assured him that nothing would transpire between him and these people, except possibly civil litigation. (*Id.*).

**D. *The Michigan State Police Investigation of the Sexual Assault.***

As discussed above, on August 18, 1995, the Washtenaw County Sheriff's Depart-

ment, consistent wish their general policy, contacted the Michigan State Police about investigating the Ahlers–Stiltner incident. Thus, on the afternoon of August 18, Detective Sgt. Gary Parsons of the Michigan State Police met with Ptaszek, Clayton, Mays, and Under Sheriff Johnson, who left shortly after Parsons arrived. (Plaintiffs' Ex. F, Parsons Deposition, pp. 16–17). During this meeting, Mays and Ptaszek described to Parsons the incident and the information that they had collected, including providing Parsons with a transcript of Stiltner's taped interview with Mays and Toth. However, at his deposition, Parsons did not remember being told that Clayton and Mays had interviewed Stiltner twice after her taped interview with Mays and Toth. (*Id.* at 18). Moreover, he did not recall being informed that Mays, Clayton, and Adams had put a wire on Stiltner in order to capture any contact she had with Ahlers on the evening/morning of August 17–18, (*Id.* at 19), or that a tape of this "wiring" existed, (*Id.* at 31). Nevertheless, at this meeting, Parsons was informed that Clayton would be his contact person with the Sheriff's Department if and when Parsons needed assistance in the course of his investigation. (*Id.* at 20).

Shortly after this meeting, Mays and Parsons interviewed Stiltner. (*Id.*). The next day, Parsons discussed the case with Clayton, specifically whether Stiltner was telling the truth. (*Id.* at 26). During this meeting, Parsons suggested that they have Stiltner call Ahlers and record the conversation. (*Id.*). Clayton agreed that this was a good idea. (*Id.*). After being unable to reach Ahlers that day—Friday—Parsons asked Clayton to have Stiltner call over the weekend and see to it that the conversation was taped. (*Id.* at 26–27). Ultimately, Stiltner contacted Ahlers on August 28, 1995 and Clayton oversaw the taping of the conversation. (*Id.* at 29). This conversation produced no admissions from Ahlers. (*Id.* at 30).

Thereafter, Parsons contacted Clayton about any corroborating witnesses and Clayton advised him that Felicia Lane may be such a witness. (*Id.* at 32). Beyond this information, Clayton provided Parsons with

no other documents or evidence regarding the alleged incident. (*Id.* at 34–35). On September 5, 1995, Parsons interviewed Ahlers. (Defendants' Ex. C, p. 1). Ahlers appeared with an attorney and invoked his right to remain silent. (*Id.*). Thus, Parsons did not obtain any statement from Ahlers. (*Id.*).

Next, Parsons prepared an initial report and sent it to the Prosecutor. (Plaintiffs' Ex. F, Parsons Deposition, pp. 35–36). On October 12, 1995, Assistant Prosecutor Joe Burke contacted Parsons and asked for the tape of the Ahlers–Stiltner telephone conversation and for an interview of Felicia Lane. (*Id.* at 36). On November 1, 1995, Parsons asked Clayton if there were any video tapes of the area where the alleged incident occurred. (*Id.* at 38). Clayton informed him that there were no videotapes of the particular area where the incident allegedly occurred, apparently indicating that the tapes which were available would not shed light on incidents that occurred on the female side. (*Id.* at 38–40). However, it apparently did not occur to either Clayton or Parsons that the videotape of the male area may have indicated whether or not Ahlers was on the male side during the general time period when Stiltner suggested that the alleged incident occurred. (Apparently at some point Parsons was led to believe, possibly by Mays or Clayton, that the incident occurred somewhere between 12:30 AM and 1:00 AM because this was the gap that the booking records reflected between the time when Stiltner was booked and Felicia Lane was booked.) (*Id.* at 40, 22–24; Plaintiffs' Ex. D, Clayton Deposition, p. 68). Additionally, there was no documentary evidence of Ahlers performing any booking activities during this period. (Plaintiffs' Ex. D, Clayton Deposition, p. 68).

During his investigation, Parsons never examined the scene of the alleged incident. (Plaintiffs' Ex. D, Parsons Deposition. p. 41). Thus, he was not aware that the door to the holding cell, if it were closed when Ahlers approached Stiltner, would have required Ahlers to "buzz" the door open while Stiltner opened it. (*Id.*). Indeed, in his deposition, Parsons admitted that in retrospect his investigation was not thorough and was not

very good. (*Id.* at 43). Although not made clear in Parsons' deposition, it is obvious that at some point in January 1996 Parsons interviewed Felicia Lane. (*Id.* at 32, 36, 43).

With respect to the thoroughness of his investigation, Parsons also admitted that during the course of his investigation, he never obtained a sworn statement from Stiltner or had her file a complaint. (*Id.* at 46). Moreover, at points not made clear in the record, Ahlers passed two polygraph exams, one "private" exam and one by the State Police. (*Id.* at 57).

Nevertheless, on February 12, 1996, Ahlers was charged with two counts of sexual assault based on a complaint sworn to by Sgt. Farkas of the Michigan State Police, apparently because Farkas, rather than Parsons, happened to be going over to the court that day. (*Id.*). On February 13, 1996, Ahlers was arraigned, which included turning himself in, being booked and processed, and being driven to court in a State Police car. (*Id.* at 47). Washtenaw County Sheriff Ronald Schebil attended this arraignment and apparently had no other involvement in this matter, (Defendants' Motion for Summary Judgment, p. 6), although Plaintiffs allege that he was responsible for assigning Mays, Clayton, and Toth to investigate Stiltner's allegations, (Plaintiffs' Complaint, p. 3).

Ahlers' preliminary examination was scheduled on February 22, 1996. (*Id.* at 53). Prior to this date, Parsons unsuccessfully attempted to contact Stiltner, and ultimately, she did not appear at the February 22, 1996 examination. (*Id.*). Thus, the examination was adjourned until March 28, 1996. (*Id.*). Between February 22, 1996 and March 25, 1996, Parsons attempted to contact Stiltner on several occasions. (*Id.*). On March 25, 1996, the Michigan State Police arrested Stiltner on two outstanding warrants—one for assault and battery and one for a probation violation. (Plaintiffs' Ex.A, p. 1). Thereafter, she was taken to the Canton Township Police Department where she was interviewed by Parsons, after he was notified that she had been arrested. (*Id.*). During this interview, Stiltner was very upset about being arrested and she seemed very "unstable." (*Id.*). In particular, she denied any

drug use, but then admitted that she had recently been using marihuana and crack cocaine and abusing alcohol. (*Id.* at 2). Moreover, Stiltner's recollection of the incident with Ahlers was very vague and inconsistent with her prior story. (*Id.*). Thus, Parsons notified the Prosecutor of his interview with Stiltner and advised him that she did not seem interested in pursuing her allegations against Ahlers. (*Id.*). On March 28, 1996, the charges against Ahlers were dismissed prior to the commencement of the preliminary examination. (*Id.* at 59). At this time, Ahlers remains an employee of the Sheriff's Department.

### III. *PROCEDURAL BACKGROUND*

In their July 25, 1996 Complaint, Plaintiffs allege that after Stiltner made her allegations of sexual assault against Ahlers: (1) The Washtenaw County Defendants and Parsons ("All Defendants") failed to reasonably investigate the sexual assault charge and caused Ahlers to be charged and arraigned without probable cause, thereby depriving him of his Fourth and Fifth Amendment rights; (2) All Defendants conspired to violate state and federal laws in their tortious and unconstitutional acts against Ahlers; (3) All Defendants are liable to Ahlers for false arrest and false imprisonment; (4) All Defendants are liable to Ahlers for malicious prosecution; (5) All Defendants were grossly negligent in their duties; (6) All Defendants are liable to Ahlers for defamation; (7) All Defendants are liable to Ahlers for intentional interference with a business relationship; (8) All Defendants are liable to Ahlers for intentional infliction of emotional distress; and (9) All Defendants are liable to Mrs. Ahlers for loss of consortium.

On November 13, 1996, the Washtenaw County Defendants moved for summary judgment, arguing that Plaintiffs' claims were barred because Ahlers had not pursued the administrative remedies available to him under the Sheriff's Department's collective bargaining agreement. On December 4, 1996, the Court conducted a scheduling conference on this matter and advised the parties that the qualified immunity issue regarding the Washtenaw County Defendants

should be decided first and that the pending motion for summary judgment regarding the collective bargaining agreement should be dismissed without prejudice pursuant to a stipulation and order. Thereafter, the Washtenaw County Defendants moved for summary judgment on the qualified immunity issue and on the state tort claims. Accordingly, the Court has stayed discovery in this matter pending the resolution of the qualified immunity issue.

## IV. ANALYSIS

### A. The Standards Applicable to Motions for Summary Judgment.

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[1] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of princi-ples to be applied to motions for summary judgment. They are summarized as follows:

   * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

   * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

   * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

   * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

   * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994).

### B. Qualified Immunity.

Pursuant to 42 U.S.C. § 1983, Plaintiffs contend that in the course of the Washtenaw County Defendants' investigation of Stiltner, Defendants failed to disclose exculpatory evidence and they ultimately caused Ahlers to be charged and prosecuted for sexual assault without probable cause in violation of his Fourth Amendment and due process rights. The Washtenaw County Defendants, howev-

---

1. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

er, argue that they are entitled to qualified immunity because their decision to turn the investigation over to the Michigan State Police and only to participate in the investigation when their assistance was requested by Parsons was objectively reasonable.

■■■ It is well-established that a claim under 42 U.S.C. § 1983 requires a showing that the plaintiff possessed a right; that he or she was deprived of that right; and that the deprivation was caused by the reckless or intentional conduct of a person acting under color of law. *See, Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155–56, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978); *Lewellen v. The Metropolitan Government of Nashville,* 34 F.3d 345, 348–49 (6th Cir.1994) ("[I]t is now firmly settled that injury caused by negligence does not constitute a 'deprivation' of any constitutionally protected interest"). Moreover, to maintain a claim against a police officer for his or her investigation of a case, a plaintiff must show that the officer's conduct violated a clearly established federal constitutional or statutory right of which a reasonable official, in the defendant officer's position, would have known. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). This limit on § 1983 claims is generally referred to as the "qualified immunity exception."

In the instant matter, Mays, Toth, and Clayton conducted a preliminary investigation regarding Stiltner's allegations. After a period of approximately 24 hours, these officers determined that they had, up to this point in time, been unable to verify Stiltner's allegations. Thus, given the magnitude of her allegations, and the inherent conflict of interest involved with a sheriff's department investigating one of its own officers, Clayton and Ptaszek decided to turn the investigation over to the Michigan State Police. The Court observes here that this decision was consistent with Department policy and with common sense. Moreover, the Court is not aware of any clearly established federal right that Ahlers enjoys which should have prohibited delegating the investigation to the Michigan State Police.

Plaintiffs, however, argue that prior to turning the investigation over to the State Police, the Sheriff's Department should have done a more complete preliminary investigation. The Department's policy, however, was to turn criminal investigations of its officers over immediately to a neutral and independent law enforcement agency. As the Court found above, this policy is objectively reasonable and Ahlers has no federal rights to an investigation conducted by the Washtenaw County Sheriff's Department in lieu of one conducted by the Michigan State Police.

Nevertheless, Plaintiffs argue further that when the Sheriff's Department turned the matter over to the State Police, the Washtenaw County Defendants should have provided Parsons with: (1) all the evidence that they had gathered, specifically informing Parsons that Stiltner had been wired and that a partial tape of this existed, and (2) all the evidence that was available, specifically the video and audio tapes of the "male side" of the booking area, reasoning that this was exculpatory evidence which should have been turned over pursuant to *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), and that because this evidence was not disclosed, Ahlers was subsequently arrested without probable cause. The Court will address these arguments *in seriatim.*

**1. *Ahlers' Right to Have Exculpatory Evidence Disclosed.***

Plaintiffs believe that Defendants violated Ahlers' Fourth Amendment and due process rights because they did not disclose the allegedly exculpatory evidence described above. Thus, Plaintiffs make 2 assumptions: (1) The evidence described above is exculpatory and (2) Ahlers has a Fourth Amendment and/or a due process right to have this evidence turned over prior to the time he was charged and arraigned.

**a. *What Evidence Is and Is Not Exculpatory.***

■■■ Plaintiffs contend that Ahlers' failure to respond to Stiltner's attempts to contact him during the night/morning following the alleged sexual assault is exculpatory. It is

well-established that evidence which is favorable to an accused and which makes it reasonably less probable that he committed the particular crime is exculpatory. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1194. Thus, the Court finds that the wiring incident, and the tape of it, could be deemed exculpatory evidence regarding the alleged sexual assault because Ahlers' refusing to "rise to the bait" and ignoring Stiltner on the day following the alleged sexual assault could suggest that the assault did not occur.

■ The video and audio tapes of the male booking area present a more difficult question. Plaintiffs contend that the tapes, if they had been preserved, might have shown that Ahlers was on the male side of the booking area during the time that Stiltner alleged he was on the female side. However, there is no clear independent corroborative evidence to suggest that Ahlers was on the male side of the booking area between 12:30 AM and 1:30 AM. Moreover, under *Arizona v. Youngblood*, 488 U.S. 51, 57–58, 109 S.Ct. 333, 337–38, 102 L.Ed.2d 281 (1988), the failure of the Washtenaw County Defendants to preserve these tapes does not violate Ahlers' rights to have the evidence disclosed unless he can show: "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir.1996).

No evidence regarding these factors is before the Court and the parties have failed to raise this issue in their briefs. Therefore, the Court concludes that based on the record and pleadings currently before it, the Court cannot find that the video and audio tapes of the male side of the booking area contained exculpatory evidence or that Ahlers had a right not to have them destroyed. However, because discovery has not yet been fully conducted, the Court is precluded from determining whether the Washtenaw County Defendants' failure to disclose and to preserve the audio and video tapes of the male side is a violation of Ahlers' federal rights and whether the Defendants' conduct in this regard is subject to qualified immunity, and therefore, summary judgment is inappropriate at this time.[2]

**b. *Which Constitutional Provisions Are Properly at Issue.***

Having found that on the record before it at this point, only the wiring of Stiltner and the tape thereof are potentially exculpatory, the Court now turns to the question of whether the failure of the officers to alert Parsons to this information or provide him with that tape is a violation of Ahlers' constitutional rights. Under *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97, and its progeny, when the prosecution or the police suppress exculpatory evidence, this conduct ordinarily violates the defendant's due process rights because it deprives the defendant of his right to a fair trial. In this case, however, the Washtenaw County Defendants' failure to disclose exculpatory information occurred before Ahlers was charged by an officer and a prosecutor that were independent of the Washtenaw County Defendants, and Ahlers was never subject to trial because the charges were eventually dismissed. Thus, this matter raises the question of whether Ahlers' rights to due process[3] were violated

2. In the normal course, Plaintiffs would have the burden of coming forward with some affirmative evidence establishing a nexus between their claims (i.e., that the tapes would have been helpful) and Defendants' conduct in not turning the tapes over and destroying them. However, because Defendants' motion was brought prior to the parties' having a full opportunity to conduct discovery, the Court cannot, at this point, preclude Plaintiffs from having the chance to discover this evidence. (This points out the problems inherent in the doctrine of requiring courts to stay discovery pending resolution of qualified immunity motions. *See, Harlow v. Fitzgerald,*

457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Invariably, evidentiary questions of this nature arise, and rather than advancing the goal of making the conduct of these cases more efficient, the requirement in some cases impedes that objective.)

3. The Washtenaw County Defendants have argued that Plaintiffs cannot rely on any due process arguments in this matter because their Complaint alleges violations of the Fifth Amendment Due Process Clause and not violations of the Fourteenth Amendment Due Process clause,

or whether his claim regarding the exculpatory evidence should be considered under some other constitutional provision.

### i. *The Supreme Court's Decision in Albright.*

In *Albright v. Oliver,* 510 U.S. 266, 267–77, 284–92, 114 S.Ct. 807, 810–14, 819–22, 127 L.Ed.2d 114 (1994), a plurality of the Court (Rehnquist, C.J., O'Connor, Scalia, and Ginsburg, JJ.) held that pretrial deprivations of liberty should only be considered under the Fourth Amendment, and Justice Souter in concurring with the judgment found that, most, but not necessarily all, pretrial deprivations of liberty should be considered under the Fourth Amendment. The facts in *Albright* were as follows:

> [A] warrant was issued for petitioner's arrest by Illinois authorities, and upon learning of it he surrendered and was released on bail. The prosecution was later dismissed on the ground that the charge did not state an offense under [State] law. Petitioner ask[ed] [the Court] to recognize a substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause.

510 U.S. at 268, 114 S.Ct. at 810.

In finding that the petitioner had no such due process right, the Plurality first observed that:

> Where a particular amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."

*Albright,* 510 U.S. at 273, 114 S.Ct. at 813 (citing *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)). Next, the Plurality stated that:

We think this principle is likewise applicable here. The Framers considered the matter of pretrial deprivations of liberty, and drafted the Fourth Amendment to address it ... We have in the past noted the Fourth Amendment's relevance to the deprivations of liberty that go hand in hand with criminal prosecutions ... We have said that the accused is not "entitled to judicial oversight or review of the decision to prosecute" ... But here petitioner was not merely charged; he submitted himself to arrest.

We express no view as to whether petitioner's claim would succeed under the Fourth Amendment, since he has not presented that question in his petition for certiorari. We do hold that substantive due process ... can afford him no relief.

*Albright,* 510 U.S. at 274–75, 114 S.Ct. at 813–14 (citations omitted). Similarly, in his Opinion, Justice Souter observed that:

> Indeed, it is not surprising that rules of recovery for [infringement of a liberty interest in freedom from the initiation of a baseless prosecution] ... have naturally coalesced under the Fourth Amendment, since the injuries usually occur only after an arrest or other Fourth Amendment seizure, an event that normally follows promptly ... upon the formality of filing an indictment, information, or complaint. There is no restraint on movement until a seizure occurs or bond terms are imposed. Damage to reputation and all of its attendant harms also tend to show up after arrest. The defendant's mental anguish ... customarily will not arise before an arrest, or at least before notification that an arrest warrant has been issued informs him of the charges.

*Albright,* 510 U.S. at 290–91, 114 S.Ct. at 822 (Souter, J., concurring in the judgment). Justice Souter's approach also resonated with Justice Ginsburg in her concurrence, but more broadly. Thus, in finding that the

---

which, according to Defendants, is significant because the Fifth Amendment does not apply to State actors. While Defendants' argument is technically correct, it is perfectly clear from Plaintiffs' Complaint and from their subsequent pleadings that they are making a due process claim against State actors under 42 U.S.C.

§ 1983. Thus, given this notice and the liberality of pleading which the Federal Rules of Civil Procedure afford, the Court will consider Plaintiffs' due process arguments even though their Complaint cites the wrong constitutional amendment.

plaintiff's claim should be under the Fourth Amendment, she stated the following:

A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip. He is required to appear in court at the state's command. He is often subject, as in this case, to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction. Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense.

A defendant incarcerated until trial no doubt suffers greater burdens. That difference, however, should not lead to the conclusion that a defendant released pretrial is not still "seized" in the constitutionally relevant sense ... He is equally bound to appear, and is hence "seized" for trial, when the state employs the less strongarm means of a summons in lieu of arrest to secure his presence in court.

This conception of a seizure and its course recognizes that the vitality of the Fourth Amendment depends upon its constant observance by police officers. For [the police officer], the Fourth Amendment governed both the manner of, and the cause for arresting Albright. If [the police officer] gave misleading testimony at the preliminary hearing, that testimony served to maintain and reinforce the unlawful haling of Albright into court, and so perpetuated the Fourth Amendment violation.

*Albright,* 510 U.S. at 278–79, 114 S.Ct. at 815–16 (Ginsburg, J., concurring).

### ii. *The Courts of Appeals Decisions Regarding Albright.*

The Courts of Appeals that have applied *Albright* have generally found that "if malicious prosecution or abuse of process is committed by state actors and results in ... an infringement of liberty ... we now know that the defendant's only constitutional remedy is under the Fourth Amendment ... and not under the due process clause directly."

*Smart v. Board of Trustees of University of Illinois,* 34 F.3d 432, 434 (7th Cir.1994); *See also, Reed v. City of Chicago,* 77 F.3d 1049, 1052 (7th Cir.1996); *Lennon v. Miller,* 66 F.3d 416, 423 n. 2 (2d Cir.1995); *Eugene v. Alief Independent School Dist.,* 65 F.3d 1299, 1303 (5th Cir.1995).

Applying this reasoning to instances where exculpatory evidence has not been disclosed is an issue with which the Fourth Circuit has struggled. First, in *Taylor v. Waters,* 81 F.3d 429, 436 (4th Cir.1996), the Court held that where a defendant who had not been subjected to trial alleges a 42 U.S.C. § 1983 claim based on an investigator's failure to disclose exculpatory evidence, the Court would, under *Albright,* look to whether this right to exculpatory information was clearly established under the Fourth Amendment. The Court's reasoning was that because the right to exculpatory information under *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97, flows from a due process right to a fair trial, any pre-trial suppression of exculpatory evidence must be examined under the Fourth Amendment since no trial was ever held. *Id.* at 436 n. 5. Next, under the Fourth Amendment, the Court held that the plaintiff's allegation of suppression of exculpatory evidence by a State investigator failed to state a clearly established constitutional violation because

although open communication between investigators and prosecutors should be encouraged, the failure of an officer to disclose exculpatory evidence after a determination of probable cause has been made by a neutral detached magistrate does not render the continuing pretrial seizure of a criminal suspect unreasonable under the Fourth Amendment ... [since] [o]nce such a determination of probable cause has been rendered ... the Fourth Amendment does not impose any further requirement of judicial oversight or reasonable investigation ...

*Id.* at 436. However, in a subsequent decision involving a failure to disclose exculpatory evidence in a case that went to trial, the Court held that the defendant did have an actionable 42 U.S.C. § 1983 claim for a violation of substantive due process under *Brady. Jean v. Collins,* 107 F.3d 1111, 1114–15 (4th

Cir.1997). Thus, the Fourth Circuit seems to now take the view that, under *Albright*, failures to disclose exculpatory evidence in cases that do not go to trial must be evaluated for § 1983 purposes under the Fourth Amendment, while those that do go to trial must be evaluated under a substantive due process standard.

The Sixth Circuit, however, has not addressed this question and the Court is somewhat troubled by the Fourth Circuit's approach in that although it is certainly true that "[t]he Framers considered the matter of pretrial deprivations of liberty, and drafted the Fourth Amendment to address it," *Albright*, 510 U.S. at 274, 114 S.Ct. at 813, it is equally true that a defendant's right to exculpatory evidence has under *Brady* and its progeny been firmly grounded in substantive due process. *Jobson, supra*, 102 F.3d at 218 ("Under the Due Process Clause, the Supreme Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence' ").

Nevertheless, the Fourth Circuit's decisions are the only authority on this point and the distinction between trial and pretrial, and pre- and post-charging/arraignment rights has both an intuitive and analytical appeal to it, particularly where the plaintiff's injuries result from the criminal charge and arraignment itself, not from a subsequent trial or jury verdict. Analytically, this distinction logically flows from the language of the Fourth Amendment itself, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

The Amendment's language, with its emphasis on rights of persons to be free from warrantless searches and seizures, and the requirement of probable cause to support such searches and seizures, clearly focuses on the liberty interest of persons to be protected against excesses of government officials prior to the commencement of any formal proceedings. Viewed in this context, although the right to have authorities consider all exculpatory evidence before a warrant for a seizure is issued and effected may, at first blush, appear to be a due process right, prior to commencement of proceedings, it is a right which really flows from the Fourth Amendment's probable cause requirement, rather than a substantive due process right, because a probable cause finding requires a balancing of available evidence.

Moreover, although the decisions are in a grand jury context, the Court is aware of a line of cases which holds that "the *Brady* standard has no application at the pre-indictment stage. At this stage, a prosecutor is not obligated to search for and present evidence favorable to targets." *In re Grand Jury 89–2*, 728 F.Supp. 1269, 1274 fn. 12 (E.D.Va.1990) (citing *United States v. Y. Hata & Co.*, 535 F.2d 508, 512 (9th Cir.), *cert. denied*, 429 U.S. 828, 97 S.Ct. 87, 50 L.Ed.2d 92 (1976); *United States v. Ruyle*, 524 F.2d 1133, 1135–36 (6th Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976); *See also United States v. Smith*, 824 F.Supp. 420, 424 (S.D.N.Y.1993)). Thus, the Court finds that Ahlers has no due process right to exculpatory evidence in this matter. Accordingly, the Court will examine Ahlers' right to exculpatory evidence under the Fourth Amendment.

### iii. *The Fourth Amendment.*

In *Taylor*, the Fourth Circuit held that it was not clearly established that a defendant had a Fourth Amendment right to the disclosure of exculpatory evidence once probable cause had been found and a warrant was issued. 81 F.3d at 436–37. In the instant matter, the alleged failure to turn over exculpatory evidence occurred many months before Ahlers was charged with and arraigned on the sexual assault crimes. Indeed, Ahlers was neither searched nor seized within the meaning of the Fourth Amendment until he surrendered himself to the Michigan State Police and was arraigned upon learning that he had been charged with criminal sexual assault. Thus, the Court finds that the Washtenaw County Defendants, failure to

disclose the allegedly exculpatory evidence could only have deprived Ahlers of his Fourth Amendment rights to the extent that he was charged with a crime and arraigned on it without probable cause. This, of course, is an argument which Ahlers has raised separately and which the Court will now consider, having found that Defendants' pre-arraignment failure to disclose exculpatory evidence is not a violation of the Constitution, except to the extent that it caused Ahlers to be charged and arraigned without probable cause.

### 2. Ahlers' Right Not to Be Charged with a Crime and Arraigned on It Without Probable Cause.

■■■ Plaintiffs have alleged that Ahlers was, contrary to the Fourth Amendment, charged and arraigned without probable cause, in part because of the allegedly inadequate preliminary investigation that the Washtenaw County Defendants conducted, including their failure to disclose the audio and video tapes of the male side of the booking area and the wiring of Stiltner and the resulting tape. Defendants respond that they had no role in either arresting or prosecuting Ahlers, and that, as a result, they cannot be liable. The Court, however, observes that because Plaintiffs are essentially arguing that probable cause to charge and arraign Ahlers would not have been found *but for* the Washtenaw County Defendants' alleged misconduct during their preliminary investigation, including their failure to disclose, the Court finds that Defendants' argument is really a matter of causation which is inherently a question for the jury. *Cf. Toth v. Yoder Co.*, 749 F.2d 1190, 1197 (6th Cir. 1984) ("Proximate causation, or the lack of it, is generally a question of fact to be decided by a jury") *with Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir.1996) ("[T]he chain of causation is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing

misstatements made by the officers to the prosecutor"). Thus, because the right not to be charged and arraigned for a crime without probable cause is a clearly established constitutional right of which objectively reasonable officers know, the Court, for the purposes of determining the Washtenaw County Defendants' qualified immunity, will examine if Ahlers was deprived of this right.

#### a. *What is Probable Cause.*

Plaintiffs contend that due to the Washtenaw County Defendants' alleged misconduct, Ahlers was charged with and arraigned on a sexual assault crime without probable cause.[4] The Washtenaw County Defendants, however, argue that there was probable cause to charge and arraign Ahlers.

■■■ Probable cause is "the facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979). Moreover, probable cause is a mixed question of fact and law in that the circumstances underlying its determination are questions of fact, while the determination itself is a question of law. *See, e.g., United States v. Ho*, 94 F.3d 932, 935 (5th Cir.1996).

#### b. *The Underlying Criminal Charges.*

On February 13, 1996, Ahlers was charged with criminal sexual conduct in the third degree and criminal sexual conduct in the fourth degree. Under Michigan law, third degree criminal sexual conduct is when:

(1) ... [a] person engages in sexual penetration with another person and if any of the following circumstances exists [sic]:

\*   \*   \*   \*   \*   \*

---

4. The Court notes here that Defendants have misconstrued Plaintiffs' Complaint. Defendants argue in their briefs that because there was "probable cause" to investigate Stiltner's allegations, they cannot be held liable because, pursuant to *Hughes v. Olmsted*, 93 F.3d 238 (6th Cir.

1996), conducting an investigation in and of itself does not violate constitutional rights. As the Court has discussed, Plaintiffs' Complaint alleges that because Ahlers was charged and arraigned due to Defendants' alleged misconduct, he was deprived of his constitutional rights.

(b) Force or coercion is used to accomplish the sexual penetration

(c) The actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless.

M.C.L.A. § 750.520d. Under the fourth degree provision,

(1) A person is guilty of criminal sexual conduct ... if he or she engages in sexual contact with another person and if any of the following circumstances exist:

\*    \*    \*    \*    \*    \*

(b) Force or coercion is used to accomplish the sexual contact....

(c) The actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless.

\*    \*    \*    \*    \*    \*

(d) That the other person is a prisoner ... under the jurisdiction of a county for purposes of imprisonment ... and the actor is an employee or contractual employee of, or a volunteer with the county who knows that the other person is under the county's jurisdiction.

M.C.L.A. § 750.520e. It is undisputed that if Stiltner's allegations were true, the above provisions would be violated.

### c. *The Facts Supporting the Probable Cause Determination.*

In his deposition, Parsons describes the facts and circumstances which formed the basis for charging Ahlers with criminal sexual assault: (1) Parsons' taped interview with Stiltner; (2) Parsons' interview with Felicia Lane (the content of which has not been represented to the Court); (3) The tape of Stiltner calling Ahlers at home; (4) The transcript of Mays and Toth's interview with Stiltner; and (5) The initial information Parsons received from his meeting with Ptaszek, Clayton, and Mays, including their representation that the booking documents and other related information did not account for Ahlers' whereabouts between 12:30 AM and 1:00 AM. (Plaintiff's Ex. F, Parsons' Deposition, pp. 22–24, 40, 43–44, 46, 32–36). More-over, Parsons prepared two reports for the Prosecutor during his investigation, a preliminary one in Fall 1995, (*Id.* at pp. 35–36), and a final one at a date not made clear in the record.

■ Plaintiffs' assert that these facts and circumstances are insufficient to support probable cause because Stiltner is not a credible witness, due to her prior arrests and her substance abuse habits, and that to the extent they create probable cause, this showing would be substantially undercut if, with regard to the Washtenaw County Defendants' misconduct, Parsons and the Prosecutor had been provided with the video and audio tapes of the male side and had known that Stiltner was wired and that a tape of this existed. On the record currently before it, the Court finds there are questions of fact regarding probable cause and the impact of the evidence that Defendants failed to disclose.

First, the Court has not been provided with: (1) Parsons' initial and final reports; (2) A tape or transcript of Parsons' interview of Stiltner; (3) A tape, transcript, or memorialization of Parsons' interview with Felicia Lane; (4) A tape or transcript of the wiring incident; (5) The booking documentation and related information for the evening/morning of the alleged sexual assault; (6) A tape or transcript of Stiltner's telephone conversation with Ahlers; and (7) A copy of the warrant charging Ahlers with sexual assault. Second, as the Court discussed above, there is insufficient evidence in the record to establish whether a factual nexus exists that would make the video and audio tapes of the male side of the booking area relevant. Third, the Court is not in a position to make credibility determinations about Stiltner since the only direct evidence the Court has with regard to her is Mays and Toth's interview of her. Thus, the Court finds that there is a genuine issue of material fact regarding whether probable cause existed and whether the showing, if any, of probable cause would have been undermined by the evidence which Plaintiffs claim the Washtenaw County Defendants wrongfully withheld. Therefore, on this basis, the Court must deny the Washtenaw County Defendants' Motion for Sum-

mary Judgment regarding their qualified immunity.

## C. *The State Law Claims.*

In addition to alleging constitutional violations and conspiracy to violate state and federal law, Plaintiffs' Complaint includes several other counts: (1) False Arrest/False Imprisonment; (2) Malicious Prosecution; (3) Gross Negligence; (4) Defamation; (5) Intentional Interference with a Business Relationship; (6) Intentional Infliction of Emotional Distress; and (7) Loss of Consortium. In moving for summary judgment on the issue of qualified immunity, the Washtenaw County Defendants have also moved for summary judgment on the other pending claims. Plaintiffs contend that Defendants are not entitled to summary judgment on these state claims because there are material issues of fact.

### 1. *Sheriff Ronald J. Schebil.*

■ Defendants have asked the Court to dismiss Sheriff Schebil from this investigation because he "had no personal involvement or personal interaction with Plaintiff in this matter." (Defendants' Motion for Summary Judgment, p. 6). In their Response, Plaintiffs contend that until they have the opportunity to depose Schebil and conduct more discovery in this matter, they are unable to determine his role in this matter.

In their Complaint, Plaintiffs allege that Schebil assigned Clayton, Mays, and Toth to investigate Stiltner's allegations and that he conspired with these officers and Ptaszek to violate Ahlers' constitutional rights. In the limited discovery that occurred between the time the Complaint was filed and the time that the Court stayed discovery, no evidence was adduced one way or the other regarding Schebil's involvement in this matter. Thus, at this time, the Court will not dismiss him from this action.

### 2. *State Law Governmental Immunity.*

■ The Washtenaw County Defendants contend that they are entitled to governmental immunity regarding Plaintiffs' state tort claims because they did not owe Ahlers any duty relevant to this case and that they did not act with gross negligence in conducting their preliminary investigation. *See* M.C.L.A. § 691.1407. Plaintiffs counter that Defendants caused Ahlers to be arrested without probable cause because they violated their duty to investigate reasonably and to turn over and preserve all relevant evidence.

■ On the record before it, the Court is unable to determine if Ahlers was arrested without probable cause and whether the probable cause calculus would have weighed in Ahlers' favor if the Washtenaw County Defendants had completely informed Parsons of all the evidence that existed when they turned the investigation over to him. Moreover, the existence or absence of gross negligence for the purposes of governmental immunity is a question of fact for the jury. *See, e.g., Tallman v. Markstrom*, 180 Mich. App. 141, 143, 446 N.W.2d 618, 619 (1989). Thus, the Court finds that there are genuine issues of material fact on this point and it cannot grant Defendants' Motion for Summary Judgment.

### 3. *Conspiracy Claims.*

■ Defendants also seek summary judgment on Plaintiffs' conspiracy claims. Specifically, Defendants state that a federal conspiracy claim requires allegations of racial or class animus which Plaintiffs have not made, and that with respect to the state conspiracy claim, there are no facts showing any agreement or preconceived plan against Ahlers. Plaintiffs respond that they have alleged a conspiracy to violate Ahlers' state law rights regarding false arrest, slander, libel, and malicious prosecution; that the limited discovery already conducted suggests this conspiracy; and that there remain genuine issues of material fact with regard to the alleged conspiracy.

■ Defendants' argument misreads Plaintiffs' Complaint and misapprehends the law. Essentially, Defendants argue that Plaintiffs cannot maintain a federal conspiracy claim because 42 U.S.C. § 1985(3) only provides a cause of action for private conspiracies predicated upon racial or class-based discrimination. While this point is indeed true, it is completely irrelevant to this case.

Plaintiffs allege that state actors conspired to deprive Ahlers of his constitutional rights and they are bringing this claim under 42 U.S.C. § 1983. It is well-established that the unavailability of a conspiracy claim under § 1985 does not preclude a conspiracy claim under § 1983. *See, Burns v. County of King,* 883 F.2d 819, 821 (9th Cir.1989); *see also, Gutierrez v. Lynch,* 826 F.2d 1534, 1538 (6th Cir.1987) (conspiracy claims may be pursued under § 1983). Thus, Defendants' argument regarding Plaintiffs' federal conspiracy claim is without logic or merit.

As for Plaintiffs' claims that the Washtenaw County Defendants conspired to deprive him of his state law rights, Defendants argue that Plaintiffs have presented no facts to suggest this conspiracy. However, Plaintiffs have had little if any opportunity to discover these facts because discovery has been stayed. Thus, the Court finds it inappropriate to grant summary judgment on the conspiracy claims at this time. The Court's conclusion here, however, does not mean that the Court will not consider a summary judgment motion on these claims after further discovery has taken place.

### 4. *False Arrest/False Imprisonment.*

■ The Washtenaw County Defendants have requested that the Court dismiss Plaintiffs' false arrest/false imprisonment claim because they never arrested, incarcerated, or held Plaintiff against his will. Plaintiffs' argument, however, is that due to Defendants' allegedly incompetent preliminary investigation and their failure to disclose exculpatory evidence, Defendants ultimately caused Ahlers to be charged with and arraigned on sexual assault crimes. As the Court noted previously, causation matters are typically fact questions for the jury. Moreover, the Court has also concluded that there are genuine issues of material fact regarding whether there was probable cause to charge Ahlers and whether the probable cause calculus would have been affected if the Washtenaw County Defendants had acted differently. Thus, the Court must also find questions of fact here and deny Defendants' Motion for Summary Judgment on this issue.

### 5. *Malicious Prosecution.*

■ Defendants have moved the Court to grant summary judgment on Plaintiffs' malicious prosecution claims, arguing that Plaintiffs cannot prove that Defendants knowingly made any false statements in this matter. Plaintiffs counter that the prosecution against Ahlers was initiated and continued without probable cause because of Defendants' misconduct and that questions of fact remain as to whether this misconduct was maliciously motivated.

■ As Defendants state in their brief, a person is liable under Michigan law for malicious prosecution where he or she makes false statements to prosecuting officials or willfully conceals facts from them, causing them to recommend issuance of a warrant. *See, Bass v. Spitz,* 522 F.Supp. 1343, 1348 (E.D.Mich.1981); *Renda v. U.A.W.,* 366 Mich. 58, 86–87, 114 N.W.2d 343, 357 (1962). Plaintiffs have alleged that Defendants failed to disclose exculpatory evidence and that there are questions of fact regarding whether they did this willfully. The Court agrees, and therefore, finds that at this time, summary judgment on these grounds is unwarranted.

### 6. *Defamation.*

■ In their Complaint, Plaintiffs allege that Defendant Ernie Milligan publicly proclaimed that Ahlers was guilty and that he was going to jail. Defendants argue that they are entitled to summary judgment on this claim because Plaintiffs have not alleged when, where, or to whom the allegedly defamatory statements were made and Milligan has stated in an affidavit that he never made any such statements, (Defendants' Ex. E, p. 2). Plaintiffs counter that they made this allegation in good faith because at least one person has told Ahlers that Milligan made these statements and that they have not yet had the opportunity to depose this person or Milligan. Thus, Plaintiffs conclude that the Court should not grant summary judgment on this claim. The Court agrees with Plaintiffs because the limited discovery in this matter prevents the Court from determining at this time whether Defendants are entitled to summary judgment on this claim.

### 7. *Intentional Interference with a Business Relationship.*

▮ Defendants argue that they are entitled to summary judgment on Plaintiffs' claim of intentional interference with a business relationship because they only took actions that were within the scope of their employment; they did not intentionally interfere with Ahlers' employment contract; and Ahlers has suffered no damages in this regard because he has been returned to service with full backpay. Plaintiffs argue that under the controlling law, as expressed in *Lytle v. Malady*, 209 Mich.App. 179, 530 N.W.2d 135 (1995), which Defendants also cite in their brief, Defendants are not entitled to summary judgment.

In *Lytle*, the Michigan Court of Appeals stated that:

> To maintain a cause of action for tortious interference with contractual relations, a plaintiff bears a heavy burden of showing that the defendant, as a corporate agent or officer, was acting outside the scope of his authority by interfering with the plaintiff's contractual relations without justification ... A corporate agent or officer may not be held liable where he acts on his employer's behalf, rather than for personal benefit.

530 N.W.2d at 146. In their Complaint, Plaintiffs allege that Defendants failed to conduct a reasonable investigation into Stiltner's allegations out of spite and that they continue to hold an internal investigation regarding the Stiltner incident over Ahlers' head in an effort to get him to resign so that they can cover up their own incompetence in the preliminary investigation. (Plaintiffs' Complaint, pp. 6, 13). Moreover, Plaintiffs allege that Schebil used the Ahlers–Stiltner incident for his own political benefit—showing that he could be tough on his own personnel in response to various scandals over the past years. (*Id.* at 4–5, 13). Thus, the Court finds that Plaintiffs have sufficiently alleged claims of intentional infliction with a business relationship against Defendants because Plaintiffs contend that Schebil initiated and supported the investigation for his own political benefit and that the other officers are threatening Ahlers with an internal investi-

gation in the hope that he will resign which will effectively cover-up their own misconduct. Given the limited factual development in the record, the Court is not in a position to grant Defendants summary judgment on this claim. However, as the Court has noted previously, the Court will entertain summary judgment motions on this claim and others in the future.

### 8. *Intentional Infliction of Emotional Distress.*

▮ Defendants state that Plaintiffs cannot maintain a claim for intentional infliction of emotional distress because this tort is not recognized by the Michigan Supreme Court and even it were a viable claim, there has been no showing of outrageous behavior rising to the level necessary to establish this claim. Plaintiffs argue, however, that while the Michigan Supreme Court has yet to recognize this tort, its elements are known and if the facts in the case meet these elements, it is a matter that should go to the jury.

▮ In *Roberts v. Auto–Owners Insurance Co.*, 422 Mich. 594, 602, 374 N.W.2d 905, 908 (1985), the Michigan Supreme Court acknowledged that the tort of intentional infliction of emotional distress has four elements: "(1) 'extreme and outrageous' conduct; (2) intent or recklessness; (3) causation; and (4) 'severe emotional distress.'" In this case, as it has in all previous cases, the Supreme Court failed to find that the plaintiffs had meet these elements. *Id.* Thus, it is technically correct for Defendants to state that the Michigan Supreme Court has not recognized the tort of intentional infliction of emotional distress. However, the Supreme Court has identified the four elements of the tort and the Michigan Court of Appeals has recently applied these elements and found that a plaintiff met them. *Haverbush v. Powelson*, 217 Mich.App. 228, 234–36, 551 N.W.2d 206, 209–10 (1996). In these circumstances, therefore, the Court finds that Plaintiffs may pursue recovery under the tort of intentional infliction of emotional distress provided that they can adduce the necessary evidence to sustain the claim. As the Court has noted previously, the factual record before it is very limited. Accordingly, at this time, the

Court will deny Defendants' Motion for Summary Judgment on this claim, in order to provide Plaintiffs with a fair opportunity to discover further evidence.

### 9. *Loss of Consortium.*

■ Finally, Defendants have moved for summary judgment on Mrs. Ahlers loss of consortium claim because, in relevant part, Plaintiffs have failed to adequately plead the claim since evidence must be presented concerning the marital relationship before and after the alleged incident. Plaintiffs have not addressed this argument in their Response.

■ As Defendants note in their brief, the Michigan Court of Appeals has stated that

Loss of consortium technically means the loss of conjugal fellowship. This encompasses loss of society, companionship, affection, services, and all other incidents of the marriage relationship. To support such a claim, evidence must be presented concerning the marital relationship before and after the [incident].

*Abraham v. Jackson,* 102 Mich.App. 567, 302 N.W.2d 235, 237–38 (1980). In their Complaint, Plaintiffs allege that Nina Ahlers was at all times relevant to this action the wife of Wayne Ahlers and that as a direct result of the conduct of Defendants, she suffered damages including: (1) the expenses of medical care, treatment, and services; (2) the loss of the services of her husband; and (3) the loss of the companionship of her husband. Therefore, it seems that Defendants argument is that they are entitled to summary judgment because Plaintiffs' Complaint does not make allegations regarding the Ahlers' marital relationship prior to the Defendants' alleged misconduct. This argument, however, is clearly incorrect because all that *Abraham* says is that in order to justify a jury award for loss of consortium there must be evidence presented at trial of the marital relationship before and after the underlying incident. Thus, while Defendants' argument may be appropriate at the directed verdict stage of a trial, it is inconsistent with the liberality of pleading under the Federal Rules of Civil Procedure and it is unwarranted at the present time given the limited

discovery that has been conducted. Accordingly, the Court will deny Defendants' Motion for Summary Judgment on the loss of consortium claim.

## V. CONCLUSION

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Washtenaw County Defendants' Motion for Summary Judgment regarding qualified immunity and the state tort claims is DENIED WITHOUT PREJUDICE;

IT IS FURTHER ORDERED that the Court's Order to Stay Discovery in this matter is VACATED and that all dates in this matter will be amended by the Court's Amended Scheduling Order of this same day.