Wayne Thomas **AHLERS** and Nina Ahlers, Plaintiffs,

v.

Ronald J. **SCHEBIL, Mark Ptaszek, Jerry Clayton, Roy Mays, Ed Toth, and Ernie Milligan, Individually and in their Official Capacities as employees of the Washtenaw County Sheriff's Department, and Gary Parsons, Individually and in his Official Capacity as a Detective Sergeant for the Michigan State Police, Defendants.**

No. 96–CV–73373–DT.

United States District Court, E.D. Michigan, Southern Division.

Feb. 18, 1998.

Juan A. Mateo, Jr., Detroit, MI, for plaintiffs.

Ian James Reach, Ann Arbor, Mark E. Donnelly, Lansing, MI, for defendants.

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

On July 25, 1996, Plaintiffs Wayne and Nina Ahlers filed a Complaint alleging that Defendants Ronald J. Schebil, Mark Ptaszek, Jerry Clayton, Roy Mays, Ed Toth, and Ernie Milligan, as officers with the Washtenaw County Sheriff's Department (the "Washtenaw County Defendants"), and Gary Parsons, as a Detective Sergeant for the Michigan State Police, violated Mr. Ahlers constitutional rights and committed various torts against him in the course of investigating him for sexually assaulting a prisoner while he was serving as an officer with the Washtenaw County Sheriff's Department.

The Court previously denied without prejudice the Washtenaw County Defendants' Motion for Summary Judgment regarding qualified immunity and the state tort claims. *Ahlers v. Schebil*, 966 F.Supp. 518 (E.D.Mich. 1997). This matter is currently before the Court on the Washtenaw County Defendants Renewed Motion for Summary Judgment, and Defendant Parsons' Motion for Summary Judgment. Having reviewed the parties' briefs and conducted a hearing on this matter, the Court is now prepared to rule. This Opinion and Order sets forth the Court's ruling.

### II. FACTUAL BACKGROUND

#### A. The Alleged Sexual Assault.

On August 17, 1995, Ms. Carrie Ann Stiltner, a known prostitute and crack addict, (Plaintiffs' Response, Ex. D, Clayton Deposition, p. 55), arrived at the 14–B District Court with 8 other prisoners, whereupon she advised one of the transport officers, Larry Clemons, that she had performed oral sex on a male officer the night before in exchange for his promise to get her some food. (Defendants' Motion for Summary Judgment, Ex. A).[1] Given the serious nature of this charge, Clemons promptly filed a report and alerted his superior, Det. Sgt. Roy Mays. (*Id.*) Later that same day, Mays and Officer Ed Toth interviewed Ms. Stiltner about the alleged incident. (Defendants' Ex. B).

In this taped interview, Stiltner described the following events. First, on the evening of August 16, 1995, Stiltner was arrested for prostitution and brought to the Washtenaw County Jail. (Defendants' Ex. A, p. 1 and Ex. B, p. 5). The officer who booked her that evening/early morning was Deputy Wayne Ahlers, the Plaintiff. Apparently, Stiltner knew Ahlers from an August 3, 1995 solicitation arrest where, during the booking process, Ahlers asked her several times, out of curiosity, how much she charged for her acts of prostitution. (Defendants' Ex. B, p. 3). It was this incident that Stiltner claimed Ahlers was referring to when, during her August 17,

---

**1.** This recitation of facts is taken from the Court's previous opinion, with minor adjustments, and thus the references in this section are to the parties' original summary judgment briefs, unless otherwise indicated.

1995 booking, he allegedly told her that they had "some unfinished business" and asked her if she remembered what they had talked about the last time. (*Id.* at pp. 3–4).

Next, Ahlers booked her, fingerprinted her, asked her some routine questions, and entered some booking information into a computer. (*Id.* at pp. 4–5). Thereafter, Ahlers asked her how much she charged for oral sex and implied that he used other prostitutes for oral sex. (*Id.* at p. 5). Subsequently, Stiltner was left alone in the holding cell. (*Id.*) However, Ahlers eventually entered the holding cell—either through the open door or because Stiltner opened the door—after he had knocked. (*Id.*); (*See also* Plaintiffs' Ex. D, Clayton Deposition, p. 92–94). Then, Stiltner repeated an earlier request for some food because she was hungry and Ahlers replied they had some "unfinished business." (Defendants' Ex. B, p. 6). Next, with the holding cell door open, Stiltner performed oral sex on Ahlers in the hope that she would get something to eat. (*Id.*). Stiltner claimed that because she had swallowed it, there was no physical evidence of this incident. (*Id.* at p. 9). Thereafter, Stiltner did not see Ahlers that evening and she never received the food that she had been promised. (*Id.* at p. 8).

### B. The Washtenaw County Sheriff's Department Investigation of the Sexual Assault.

While this interview with Stiltner was occurring, Sgt. Webber notified other key members of the Sheriff's Department of the alleged incident, including First Lieutenant Jerry Clayton. After Mays and Toth interviewed Stiltner, Clayton and Mays talked with Stiltner and she essentially repeated the same allegations. (Plaintiffs' Response, Ex. D, Clayton Deposition, p. 28–29). Later that evening, Clayton and Mays again talked with Stiltner. During this conversation, Stiltner's story remained the same, although she made it clear that the alleged assault occurred sometime after the booking process and prior to the time that another female inmate, Felicia Lane, was put in the holding cell with her. (*Id.* at p. 32–33).

Mays, Clayton, and Commander Mark Wusthoff decided to "put a wire" on Stiltner and isolate her so that they could obtain corroborating evidence from any contacts that she would have that evening with Ahlers when he came on duty at 11 PM. (*Id.* at p. 37). The wire was actually placed on Stiltner by a female officer, Acting Sgt. Andrea Adams. Clayton then gathered and examined a series of documents and records, including those produced during the booking process on August 16—August 17, to determine if Stiltner's story was possible. (*Id.* at p. 38). Apparently, these documents and records do not account for Ahlers' whereabouts between 12:30 AM and 1:00 AM, which was the period of time between Stiltner's and Lane's bookings. (Plaintiffs' Ex. F., Parsons Deposition, p. 40, 22–24).

As indicated, the alleged incident occurred in the female holding cell which is located on the "female side" of the booking area. The booking area is approximately 30–40 feet long and 15–20 feet wide. (Plaintiffs' Ex. D, Clayton Deposition, p. 44). This area is particularly busy in the late evening and early morning, when the alleged incident occurred. (Defendants' Reply, Alvarez Affidavit, p. 3). Indeed, at any point in time, a member of the 7–person staff or various on-duty or visiting officers would enter the booking area to perform their duties or deliver, release, or take away prisoners. (Plaintiffs' Response, Ex. B, Johnson Deposition, p. 19–21).

Moreover, the "male side" of the booking area and the male holding cell are monitored by video and audio monitors. (Defendants' Reply, Clayton Deposition, p. 60–63). The female side of the booking desk and the female holding cell, however, were not monitored by either audio or video at this time. (*Id.*). Because the female side, where the alleged incident occurred, was not monitored, Clayton and the other officers investigating this incident did not examine or preserve the male side audio or video tape from the evening/morning in question. (*Id.* at 62–63). In particular, Clayton explained that he did not look at this tape or preserve it or give it to Parsons when he asked for such video or audio tapes because in his experience these tapes had not proved useful in determining

what events had transpired on the female side. (*Id.* at 60–64). The investigating officers also did not interview Ahlers' immediate supervisor, Sgt. Donna Johnson, (*Id.* at 64–65), who, from her office off the booking area, can monitor these video and audio tapes and who was on duty during the evening/morning when the incident allegedly occurred, (Plaintiffs' Response, Ex. B, Johnson Deposition, p. 24). Additionally, the investigating officers did not interview Robert Alvarez, Ahlers' booking partner during the night/morning in question. (Defendants' Reply, Alvarez Deposition, pp. 4–5). According to Alvarez, he does not recall Ahlers leaving his side between 12:30 AM and 1:00 AM and he does not believe that such an incident could have occurred without someone seeing it due to the ebb and flow of people and officers passing through the booking area. (Plaintiffs' Ex. C, Alvarez Affidavit, p. 3).

During the late evening of August 17, 1995 and the early morning of August 18, 1995, while Stiltner was wearing the wire, Ahlers did not attempt to make any contact with Stiltner. (Plaintiffs' Response, Ex. D, Clayton Deposition, pp. 49–51). The wire also revealed that when Stiltner called for Ahlers or asked to speak to him, he did not respond. (*Id.*). The record is not clear whether a tape was made of the "wiring" while Clayton, Mays, Adams, and Detective Grimm listened. (*Id.*).

At this time, because the Sheriff's Department "felt [Stiltner's charge] was a substantial enough charge and . . . couldn't [be] ver-if[ied] . . ., [the investigating officers] felt [they should] turn [the investigation] over to somebody outside and let them do it." (Plaintiffs' Response, Ex. D, Clayton Deposition, p. 59). Apparently, it is the Department's policy to have a neutral, independent law enforcement agency investigate substantial criminal allegations made about its officers' conduct in order to avoid conflict of interest. (*Id.* at 58). Thus, on August 18, 1995, Clayton and Wusthoff decided to turn the investigation over to the Michigan State

Police. (*Id.* at 58–60). From September 1, 1995 through February 13, 1996 (pre-charging/arraignment), Ahlers was suspended with pay, and from February 13, 1996 through March 28, 1996 (post-charging/arraignment), without pay. (Plaintiffs' Complaint, p. 4).

After August 18, 1995, the Washtenaw County Sheriff's Department was no longer involved in the criminal investigation of Ahlers. (*Id.* at 69). Clayton's only continuing involvement was as a liaison to the Michigan State Police—i.e., he provided the State Police with documents and records and assistance when they asked for it. This assistance included producing Felicia Lane's booking card and tapping Ahlers' home telephone in an unsuccessful attempt to obtain incriminating statements from an arranged telephone call from Stiltner. (*Id.* at 69–70, 88–89). Clayton also had responsibility for conducting an internal investigation regarding the Ahlers–Stiltner incident. (*Id.* at 70–74). But when the Michigan State Police came into the investigation on August 18, the internal investigation was suspended. (*Id.* at 74). The internal investigation was not resumed until after the criminal charges against Ahlers were dismissed on March 28, 1996. Thereafter, pursuant to the internal investigation, Clayton interviewed Ahlers about the incident on April 16, 1996. (*Id.* at 112). Subsequently, though, Commander Ptaszek relieved Clayton of this responsibility because Ahlers had apparently threatened Clayton. (*Id.* at 70, 75). While it appears that the Department has yet to conduct or is not going to conduct an internal investigation into the Ahlers–Stiltner incident, (*Id.* at 75–76), the Washtenaw Defendants claim that Mr. Ahlers filed his complaint before the investigation could be resumed, "resulting in all internal investigations being placed on hold to prevent any authorized statements being made or sought which might be in conflict with the legal action." (Washtenaw County Defendants Renewed Motion for Summary Judgment, p. 2)(herein "Wash. Co. Defendants' Brief").[2]

---

**2.** This lack of action appears to contradict the Department's February 13, 1996 press release, in which the Department stated that it would conduct an internal investigation of this matter since

criminal charges had been filed. However, Defendants claim that this press release was never published or released. (Wash. Co. Defendants' Brief, p. 2). Furthermore, they contend that the

## C. *The Michigan State Police Investigation of the Sexual Assault.*

As discussed above, on August 18, 1995, the Washtenaw County Sheriff's Department, consistent with their general policy, contacted the Michigan State Police about investigating the Ahlers–Stiltner incident. Thus, on the afternoon of August 18, Detective Sgt. Gary Parsons of the Michigan State Police met with Ptaszek, Clayton, Mays, and Under Sheriff Johnson, who left shortly after Parsons arrived. (Plaintiffs' Ex. F, Parsons Deposition, pp. 16–17). During this meeting, Mays and Ptaszek described to Parsons the incident and the information that they had collected, including providing Parsons with a transcript of Stiltner's taped interview with Mays and Toth. However, at his deposition, Parsons did not remember being told that Clayton and Mays had interviewed Stiltner twice after her taped interview with Mays and Toth. (*Id.* at 18). Moreover, he did not recall being informed that Mays, Clayton, and Adams had put a wire on Stiltner in order to capture any contact she had with Ahlers on the evening/morning of August 17–18, (*Id.* at 19), or that a tape of this "wiring" existed, (*Id.* at 31). Nevertheless, at this meeting, Parsons was informed that Clayton would be his contact person with the Sheriff's Department if and when Parsons needed assistance in the course of his investigation. (*Id.* at 20).

Shortly after this meeting, Mays and Parsons interviewed Stiltner. (*Id.*). The next day, Parsons discussed the case with Clayton, specifically whether Stiltner was telling the truth. (*Id.* at 26). During this meeting, Parsons suggested that they have Stiltner call Ahlers and record the conversation. (*Id.*). Clayton agreed that this was a good idea. (*Id.*). After being unable to reach Ahlers that day—Friday—Parsons asked Clayton to have Stiltner call over the weekend and see to it that the conversation was taped. (*Id.* at 26–27). Ultimately, Stiltner contacted Ahlers on August 28, 1995 and Clayton oversaw the taping of the conversation. (*Id.* at 29). This conversation pro-

duced no admissions from Ahlers. (*Id.* at 30).

Thereafter, Parsons contacted Clayton about any corroborating witnesses and Clayton advised him that Felicia Lane may be such a witness. (*Id.* at 32). Beyond this information, Clayton provided Parsons with no other documents or evidence regarding the alleged incident. (*Id.* at 34–35). On September 5, 1995, Parsons interviewed Ahlers. (Defendants' Ex. C, p. 1). Ahlers appeared with an attorney and invoked his right to remain silent. (*Id.*). Thus, Parsons did not obtain any statement from Ahlers. (*Id.*).

Parsons next prepared an initial report and sent it to the Prosecutor. (Plaintiffs' Ex. F, Parsons Deposition, pp. 35–36). On October 12, 1995, Assistant Prosecutor Joe Burke contacted Parsons and asked for the tape of the Ahlers–Stiltner telephone conversation and for an interview of Felicia Lane. (*Id.* at 36). On November 1, 1995, Parsons asked Clayton if there were any video tapes of the area where the alleged incident occurred. (*Id.* at 38). Clayton informed him that there were no videotapes of the particular area where the incident allegedly occurred, apparently indicating that the tapes which were available would not shed light on incidents that occurred on the female side. (*Id.* at 38–40). However, it apparently did not occur to either Clayton or Parsons that the videotape of the male area may have indicated whether or not Ahlers was on the male side during the general time period when Stiltner suggested that the alleged incident occurred. (Apparently at some point Parsons was led to believe, possibly by Mays or Clayton, that the incident occurred somewhere between 12:30 AM and 1:00 AM because this was the gap that the booking records reflected between the time when Stiltner was booked and Felicia Lane was booked). (*Id.* at 40, 22–24; Plaintiffs' Ex. D, Clayton Deposition, p. 68). Additionally, there was no documentary evidence of Ahlers performing any booking activities during this period. (Plaintiffs' Ex. D, Clayton Deposition, p. 68).

---

first time the release left the file was during the discovery in this case and that a story published

in the *Ypsilanti Press* was not based upon information from their office. (*Id.* at 2).

During his investigation, Parsons never examined the scene of the alleged incident. (Plaintiffs' Ex. D, Parsons Deposition. p. 41). Thus, he was not aware that the door to the holding cell, if it were closed when Ahlers approached Stiltner, would have required Ahlers to "buzz" the door open while Stiltner opened it. (*Id.*). Indeed, in his deposition, Parsons admitted that in retrospect his investigation was not thorough and was not very good. (*Id.* at 43). Although not made clear in Parsons' deposition, it is obvious that at some point in January 1996 Parsons interviewed Felicia Lane. (*Id.* at 32, 36, 43).

With respect to the thoroughness of his investigation, Parsons also admitted that during the course of his investigation, he never obtained a sworn statement from Stiltner or had her file a complaint. (*Id.* at 46).

Nevertheless, on February 12, 1996, Ahlers was charged with two counts of sexual assault based on a complaint sworn to by Sgt. Farkas of the Michigan State Police, apparently because Farkas, rather than Parsons, happened to be going over to the court that day. (*Id.*). On February 13, 1996, Ahlers was arraigned, which included turning himself in, being booked and processed, and being driven to court in a State Police car. (*Id.* at 47). Washtenaw County Sheriff Ronald Schebil attended this arraignment and apparently had no other involvement in this matter, (Defendants' Motion for Summary Judgment, p. 6), although Plaintiffs allege that he was responsible for assigning Mays, Clayton, and Toth to investigate Stiltner's allegations, (Plaintiffs' Complaint, p. 3).

Ahlers' preliminary examination was scheduled on February 22, 1996. (*Id.* at 53). Prior to this date, Parsons unsuccessfully attempted to contact Stiltner, and ultimately, she did not appear at the February 22, 1996 examination. (*Id.*). Thus, the examination was adjourned until March 28, 1996. (*Id.*). Between February 22, 1996 and March 25, 1996, Parsons attempted to contact Stiltner on several occasions. (*Id.*). On March 25, 1996, the Michigan State Police arrested Stiltner on two outstanding warrants—one for assault and battery and one for a probation violation. (Plaintiffs' Ex.A, p. 1). Thereafter, she was taken to the Canton

Township Police Department where she was interviewed by Parsons, after he was notified that she had been arrested. (*Id.*). During this interview, Stiltner was very upset about being arrested and she seemed very "unstable." (*Id.*). In particular, she denied any drug use, but then admitted that she had recently been using marihuana and crack cocaine and abusing alcohol. (*Id.* at 2). Moreover, Stiltner's recollection of the incident with Ahlers was very vague and inconsistent with her prior story. (*Id.*). Thus, Parsons notified the Prosecutor of his interview with Stiltner and advised him that she did not seem interested in pursuing her allegations against Ahlers. (*Id.*). Furthermore, by this time Ahlers has taken, and passed, two polygraph examinations—one through a private company on February 20, 1996 and the second, conducted by the Michigan State Police, on March 20, 1996. On March 28, 1996, the charges against Ahlers were dismissed prior to the commencement of the preliminary examination. (*Id.* at 59). At this time, Ahlers remains an employee of the Sheriff's Department.

### III. *PROCEDURAL BACKGROUND*

In their July 25, 1996 Complaint, Plaintiffs allege that after Stiltner made her allegations of sexual assault against Ahlers: (1) The Washtenaw County Defendants and Parsons ("All Defendants") failed to reasonably investigate the sexual assault charge and caused Ahlers to be charged and arraigned without probable cause, thereby depriving him of his Fourth and Fifth Amendment rights; (2) All Defendants conspired to violate state and federal laws in their tortious and unconstitutional acts against Ahlers; (3) All Defendants are liable to Ahlers for false arrest and false imprisonment; (4) All Defendants are liable to Ahlers for malicious prosecution; (5) All Defendants were grossly negligent in their duties; (6) All Defendants are liable to Ahlers for defamation; (7) All Defendants are liable to Ahlers for intentional interference with a business relationship; (8) All Defendants are liable to Ahlers for intentional infliction of emotional distress; and (9) All Defendants are liable to Mrs. Ahlers for loss of consortium.

On November 13, 1996, the Washtenaw County Defendants moved for summary judgment, arguing that Plaintiffs' claims were barred because Ahlers had not pursued the administrative remedies available to him under the Sheriff's Department's collective bargaining agreement. On December 4, 1996, the Court conducted a scheduling conference on this matter and advised the parties that the qualified immunity issue regarding the Washtenaw County Defendants should be decided first and that the pending motion for summary judgment regarding the collective bargaining agreement should be dismissed without prejudice pursuant to a stipulation and order. Thereafter, the Washtenaw County Defendants moved for summary judgment on the qualified immunity issue and on the state tort claims.

On April 30, 1997, the Court issued an opinion denying the Washtenaw County Defendants' Motion for Summary Judgment based on qualified immunity. Specifically, the Court held that:

(1) the tape showing Ahlers' failure to respond to Stiltner's attempts to contact him during night following his alleged sexual assault of her could be exculpatory evidence;

(2) a genuine issue of material fact precluded summary judgment on whether the Washtenaw County Defendants' failure to preserve video and audio tapes of male booking area during one-half hour period when sexual assault allegedly occurred in female booking area violated officer's rights to have that evidence disclosed;

(3) a genuine issue of material fact precluded summary judgment for Defendants on the issue of whether probable cause to charge and arraign officer would not have been found but for Washtenaw County Defendants' alleged misconduct during their preliminary investigation;

(4) Ahlers' right not to be charged and arraigned for a crime without probable cause was a clearly established constitutional right of which objectively reasonable officers know, for purposes of determining Washtenaw County Defendants' qualified immunity;

(5) sheriff would not be dismissed from Ahlers' state law tort claims;

(6) a genuine issue of material fact precluded summary judgment on Ahlers' claims that the Washtenaw County Defendants conspired to deprive him of his state law rights;

(7) Ahlers' allegations that Washtenaw County Defendants failed to disclose exculpatory evidence precluded summary judgment for Defendants in his action under Michigan law for malicious prosecution; and

(8) limited discovery before it was stayed precluded summary judgment for Washtenaw County Defendants on officer's defamation, intentional interference with business relationship, and intentional infliction of emotional distress claims under Michigan law.

*Ahlers v. Schebil,* 966 F.Supp. 518 (E.D.Mich. 1997). Due to the limited amount of discovery, many of the fact intensive issues could not be resolved at that early stage of the litigation. Thus, the Court denied the Washtenaw County Defendants' motion without prejudice.

Discovery is now complete, and the Washtenaw County Defendants have renewed their Motion for Summary Judgment. Defendant Parsons has also filed a Motion for Summary Judgment.

## IV. *STANDARD OF REVIEW*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggre-

gate, lowered the movant's burden on a summary judgment motion.[3] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

**3.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994).

## V. ANALYSIS

### A. Constitutional Claims

Plaintiffs bring this action under 42 U.S.C. § 1983 contending that in the course of the Washtenaw County Defendants' investigation of Stiltner, they failed to disclose exculpatory evidence, ultimately causing Ahlers to be charged and prosecuted for sexual assault without probable cause in violation of his Fourth Amendment rights. Plaintiffs also claim that Defendant Parsons was responsible for charging and arraigning Plaintiff Ahlers without probable cause. The Washtenaw County Defendants, however, argue that they are entitled to qualified immunity because their decision to turn the investigation over to the Michigan State Police and only to participate in the investigation when their assistance was requested by Parsons was objectively reasonable. Furthermore, Defendant Parsons claims that he is entitled to qualified immunity because, even if he lacked probable cause to submit his reports to the Washtenaw County Prosecutor's Office, the prosecutor and the neutral magistrate judge authorized and issued the warrants.

It is well-established that a claim under 42 U.S.C. § 1983 requires a showing that the plaintiff possessed a right; that he or she was deprived of that right; and that the deprivation was caused by the reckless or intentional conduct of a person acting under color of law. *See, Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–56, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978); *Lewellen v. The Metropolitan Government of Nashville*, 34 F.3d 345, 348–49 (6th Cir.1994) ("[I]t is now firmly settled that injury caused by negligence does not constitute a 'deprivation' of any constitutionally protected interest"). Moreover, to maintain a claim against a police officer for his or her investigation of a case, a plaintiff must show that the officer's conduct violated a clearly established federal

10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

constitutional or statutory right of which a reasonable official, in the defendant officer's position, would have known. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). This limitation on § 1983 claims is generally referred to as the "qualified immunity exception."

In the instant matter, Mays, Toth, and Clayton conducted a preliminary investigation regarding Stiltner's allegations. After a period of approximately 24 hours, these officers determined that they had, up to that point in time, been unable to verify Stiltner's allegations. Thus, given the magnitude of her allegations, and the inherent conflict of interest involved with a sheriff's department investigating one of its own officers, Clayton and Ptaszek decided to turn the investigation over to the Michigan State Police. As the Court observed in its previous opinion, that decision was consistent with Department policy and with common sense.

Plaintiffs, however, argue that prior to turning the investigation over to the State Police, the Sheriff's Department should have done a more complete preliminary investigation. The Department's policy, however, was to turn criminal investigations of its officers over immediately to a neutral and independent law enforcement agency. Again, this policy is objectively reasonable and Ahlers has no federal constitutional right to an investigation conducted by the Washtenaw County Sheriff's Department in lieu of one conducted by the Michigan State Police.

### 1. Failure to provide exculpatory evidence

■ Nevertheless, Plaintiffs argue that when the Sheriff's Department turned the

matter over to the State Police, the Washtenaw County Defendants failed to provide Parsons with all of the relevant evidence, including:

(1) Stiltner's body wire tape

(2) the male side video

(3) Washtenaw County Sheriff's Department daily report of jail population and cell rosters

(4) Quinton Evans' computer records

(5) Mendell McQueen's computer records

(6) Larry Clemons' original statement

(Plaintiffs' Brief, p. 24–35). Plaintiffs' contention is that these pieces of information, taken together, constitute exculpatory evidence which should have been turned over pursuant to *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), and that because this evidence was not disclosed, Ahlers was subsequently arrested without probable cause. The Court ruled in its previous opinion that Ahlers had a Fourth Amendment right to have any exculpatory evidence turned over to the agency ultimately responsible for the investigation prior to the time he was charged and arraigned. Thus, the instant inquiry must focus on whether the above-mentioned items can fairly be characterized as exculpatory.[4]

■ *Brady* requires the government to provide evidence which is favorable to the accused and which is "material." *United States v. Frost,* 125 F.3d 346, 382 (6th Cir. 1997). A showing of materiality does not require that the defendant prove that the result of the proceeding would probably have

---

4. At oral argument, defense counsel relied upon a recent Sixth Circuit case, *Mays v. City of Dayton,* 134 F.3d 809 (6th Cir.1998). In *Mays,* the plaintiffs brought suit under § 1983, claiming that police executed a search of their offices without probable cause. Specifically, the plaintiffs contended that the police officer's omission in his supporting affidavit of the fact that he had attempted unsuccessfully to gather inculpatory evidence during an undercover investigation violated his *Brady* rights. The Sixth Circuit ruled that the district court erred by applying the *Brady* analysis, and held that the inquiry should have been whether the affiant included a false statement in the affidavit, knowingly and intentionally

or with reckless disregard for the truth, under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

*Mays* is distinguishable from the instant case, however, because the instant case does not involve an allegation that the affiant, here Mr. Parsons, included false statements from the affidavit, or knowingly excluded material information. Rather, the issue in the instant case is whether the Washtenaw County Defendants violated Plaintiff's constitutional rights by maliciously or recklessly failing to disclose Brady material to the law enforcement agency responsible for the investigation.

been different. *See, e.g., Frost,* 125 F.3d at 382; *United States v. O'Dell,* 805 F.2d 637, 641 (6th Cir.1986). Rather, evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Frost,* 125 F.3d at 383 (quoting *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).[5] *See also, United States v. Bencs,* 28 F.3d 555, 560 (6th Cir.1994); *United States v. Presser,* 844 F.2d 1275, 1281 (6th Cir.1988). Of course, it is often difficult to ascertain whether evidence is "favorable" because evidence that seems exculpatory may be interpreted as inculpatory under a different theories.

A close examination of the Supreme Court's decision in *Kyles* clarifies the context in which such evidence should be considered and evaluated. In the murder trial of Curtis Kyles, the prosecution argued that the killer drove to the lot where the murder occurred, killed the victim, and drove off in the victims car, leaving his car in the lot. The police failed to disclose a list of the cars in the lot, which did not include Kyles car. The state argued that the list was neither impeachment nor exculpatory evidence because Kyles could have moved his car before the list was created and because the list did not purport to be a comprehensive listing of all of the cars in the lot. *Kyles,* 115 S.Ct at 1574.

The Supreme Court ruled that the evidence was "material," and that it would have helped to counter the prosecution's theory and contradict the testimony of some of their witnesses. The Court correctly noted that the test is not, and cannot be, whether the evidence is favorable to the defendant under every plausible interpretation or theory. The Court stated:

[The state's] argument, however, confuses the weight of the evidence with its favorable tendency, and even if accepted would work against the State, not for it.... But however the evidence would have been used, it would have had some weight and its tendency would have been favorable to Kyles.

*Kyles,* 115 S.Ct. at 1574.

Thus, the focus of this inquiry must be whether the evidence, taken from the defendant's perspective, has a "favorable tendency." This determination is not made on an item-by-item basis, because the "Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles,* 115 S.Ct. at 1567 (citing *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). What must be determined here is whether there is a reasonable probability that the magistrate's determination that probable cause existed would have been different if the evidence in question, "considered collectively," had been disclosed. *Kyles,* 115 S.Ct. at 1567. Therefore, the Court will discuss the items *in seriatim,* and then make its determination based on the cumulative effect of all the undisclosed evidence.

### (a) Stiltner's body wire tape

Plaintiffs contend that Ahlers' failure to respond to Stiltner's attempts to contact him during the night/morning following the alleged sexual assault is exculpatory. In its previous opinion, the Court stated that the wiring incident, and the tape of it, *could* be deemed exculpatory evidence regarding the alleged sexual assault because Ahlers' refusing to "rise to the bait" and ignoring Stiltner on the day following the alleged sexual as-

---

**5.** As the Sixth Circuit stated in *O'Dell,* 805 F.2d at 641:

> Further, *Agurs* has been modified by the Supreme Court's decision in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), in which the Court adopted two standards for determining the materiality of evidence withheld by the prosecution. *Bagley* suggests that in cases involving the knowing use of perjured testimony by the prosecution, the conviction will be set aside "if there is any reasonable likelihood that the false testimony

could have affected the judgment of the jury." *Id.* 105 S.Ct. at 3382 (citing *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397). However, in cases involving no requests for exculpatory material, a general request, or a specific request, the evidence will be considered material and the conviction set aside "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* 105 S.Ct. at 3384.

sault could suggest that the assault did not occur.

The current pleadings and attached exhibits demonstrate that there are several disputes about the entire taping incident. As noted, a microphone was placed on Stiltner in the hope that she would elicit statements from Ahlers which presumably would be inculpatory. According to Detective Mays, who was the person responsible for turning on the taping machine receiving the signal, he never turned it on because there was never any conversation between Stiltner and Ahlers to record. (Mays Dep. 57–58, Plaintiff's Ex. P). Thus, according to Defendants, no audiotape **was** generated, partial or otherwise, and there was no evidence to turn over or destroy.

However, Lt. Clayton testified he monitored the wire for the entire shift and that some of the attempted conversations by Stiltner were recorded. (Clayton Dep., p. 46–51; Plaintiff's Ex. K). He also testified that he thought the tape had been turned over to Detective Parsons. (*Id.*) While Plaintiffs correctly point out these contradictions, they make no assertion that a tape actually exists. Further, Lt. Clayton has not produced any documents to substantiate his assertions, and Det. Parsons' handwritten notes of the initial briefing with Washtenaw County personnel makes no mention of the wiring incident. (Parsons' Ex. 1).

Given this conflict in the evidence, the Court cannot determine whether, in fact, a tape exists or existed.[6] However, it ultimately does not matter whether a tape of Stiltner trying to bait Ahlers exists because the fact that Mays and Clayton did not generate inculpatory evidence against Ahlers is not in dispute. The critical issue is simply whether the Washtenaw County Defendants should have disclosed the incident to Det. Parsons. Parsons testified in deposition that he would have liked to have been informed about the incident:

Q. And with regard to all those conversations, did Mr. Clayton at any time ever talk to you about the fact that they had wired Carrie Stiltner for one whole shift?

A. No.

Q. Don't you think, sitting here now as an investigator, that may have been a pretty important point for him to reveal to you?

A. I guess. I don't know. If that's something that they did prior to my becoming involved, I don't know. I mean, yeah, I would have liked to have known.

Q. It's an important thing that you should have known about, isn't that a fair statement sir?

A. Yeah, that's fair.

(Parsons' Dep., pp. 30–31).

Parsons did not testify how or why the information would have been important. On the one hand, this incident obviously could be interpreted as exculpatory because Ahlers failed to rise to the bait and make incriminating statements. Clearly, had they been successful in obtaining inculpatory evidence against Ahlers, that evidence would have been turned over to Parsons, and properly so. Thus, the fact that they tried and failed to inculpate Ahlers has some significance. On the other hand, Ahlers' decision not to speak to Stiltner could also be viewed as a decision to avoid Stiltner because, if the assault did occur, he would not want to be near the victim for the very reason of preventing a conversation about the sexual misconduct. Therefore, there are two equally plausible interpretations of the evidence, one benign, the other supportive of, or favorable to, Ahlers' theory.

In the final analysis, it would seem that this information should have at least been given to Parsons—as he indicated he would have wanted—so that he could evaluate it in light of all of the other factors of which he was aware, and give it whatever weight he believed it deserved. Effectively, Parsons was the fact-finder, and as in *Kyles*, the ultimate question of the value of the evidence is one of its weight. The fact-finder should

---

**6.** Plaintiffs seem to imply that Sgt. Johnston's testimony that Clayton told her Stiltner kept turning the device on and off, making it difficult to hear the conversations, somehow supports the contention that a tape was made. But this would have no bearing on whether or not a tape was made because Stiltner controlled the transmitter, not the taping device.

have had the opportunity to consider and evaluate this information.

### (b) Male side video

Plaintiffs contend that the male side video tapes, if they had been preserved, might have shown that Ahlers was on the male side of the booking area during the time that Stiltner alleged he was on the female side. In its previous opinion, the Court concluded that based on the record and pleadings before it at that time, there was a genuine issue of material fact as to whether the video and audio tapes of the male side of the booking area contained exculpatory evidence or that Ahlers had a right not to have them destroyed.[7] Additional discovery has clarified the content and probative value of the tapes.

A demonstrative sampling of the videotapes from random midnight shifts has been produced by the Washtenaw County Defendants. These tapes were taken from the same camera that was filming the night of the alleged incident. The Washtenaw County Defendants contend that the tapes are not exculpatory evidence because the demonstrative tapes show that the camera angle shows nothing of the female holding cell or the officer's desk area, where Ahlers is often sitting. In short, Defendants claim the tapes would have been unhelpful because they would not have caught the alleged sexual acts or Ahlers on tape.

Defendants fail to recognize, however, that inferences drawn from the activities and people captured on the videotape, which is time stamped, could have accounted for Plaintiff's whereabouts between 12:30 a.m. and 1:00 a.m., the timeframe in which the alleged assault occurred. The tape captures people standing at the booking window while they are being booked. Thus, because the record shows that Ahlers, on the other side of the window, booked certain people that night, the tape could have confirmed his whereabouts by simply showing when people known to have been booked by Ahlers were standing at the window. Specifically, Plaintiff notes that the tape would have verified the following:

(1) when Plaintiff was done booking Carrie Stiltner because it would have captured the precise time she was at the booking counter,

(2) when Quinton Evans was processed and released,

(3) how long inmate Mendell McQueen remained at the counter while Plaintiff processed him at 12:55 a.m.,

(4) when other personnel began to arrive at the booking area for purposes of the briefing which began at approximately 1:00 a.m. and lasted forty minutes,

(5) when Pam Raciti transferred three males through the booking counter area to be housed in the medical unit, passing right by the female holding cell at approximately 12:45 a.m., and

(6) when Officer Hazelton conducted his perimeter checks, one of which occurred at approximately 12:50 a.m.

For each minute of Plaintiff's time the tape could account for, the likelihood he committed the crime decreases. The tape could show that Plaintiff's opportunities to commit the crime were sparse. For example, if inferences from the tape can show that Plaintiff only had one minute unaccounted for, the likelihood that he committed the crime would

---

**7.** The first inquiry, whether the evidence was exculpatory and should have been disclosed, is a *Brady* question that hinges upon the same factors articulated above. The second inquiry, whether Ahlers had a right not to have the evidence destroyed, is necessary only if the government has complied with *Brady*. *See, Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 336, 102 L.Ed.2d 281 (1988)("There is no question but that the State complied with *Brady* and *Agurs.* * * * If respondent is to prevail on federal constitutional grounds, then, it must be because of some constitutional duty over an above that imposed by cases such as *Brady* and *Agurs.*").

In order for defendant to be entitled not to have the evidence destroyed he or she must prove: "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Jobson,* 102 F.3d 214, 218 (6th Cir. 1996). The Court set out this framework in its last opinion, not knowing what further discovery would uncover. But because the Court rules here that Defendants failed to comply with *Brady,* the *Youngblood* inquiry is not relevant.

be much less than if he had two hours unaccounted for.

This evidence, which records the exact time the taped events are occurring, would have been especially critical in this case because Defendants' have called into question the evidentiary value of any of the documents Plaintiff produced during his shift on the night in question. Defendants argue in their brief that the documents "are not reliable evidence of when any event occurred." (Wash. Co. Defendants' Brief, p. 9). They also strongly suggest Ahlers could have tampered with these documents to cover his tracks after committing the crime. (*Id.* at 9, 10). Given Defendants' attacks on the documentary evidence, and the importance of establishing the timing of the night's events, the objective and unaltered videotape evidence, had it been preserved, may well have had a favorable tendency to Ahlers' case, even if only to corroborate his written documentation and his story.

### (c) Daily Report of Jail Population (Traffic Sheet) and Cell Rosters

The "traffic sheet" purportedly shows when detainees are booked in and released.[8] The traffic sheet for the midnight shift of August 16–17 was prepared by Plaintiff Ahlers. (Ahlers Dep., p. 108). A traffic sheet is started with each shift, and detainees who are brought in but not booked are transferred to the new shift's sheet and booked in and logged on the traffic sheet when time permits. On the night in question, Ms. Stiltner was one of five persons held over from the previous shift, as she was listed as being brought in at 4:40 p.m. in the afternoon, but not booked until Plaintiff booked her during the midnight shift. The traffic sheet does not indicate the time a detainee is booked in, only when he/she is brought into the jail.

Plaintiffs claim the traffic sheet is important evidence because it lists Fakeisha Brown a/k/a Felicia Lane as being brought in to the jail about 1:00 a.m. Defendants argue that Ms. Lane must have been in the holding cell with Stiltner sometime near or after 2:00 a.m., at which time Stiltner told Lane of the alleged sexual assault. Defendants claims this discrepancy is not unusual because the traffic sheet does not provide the actual time a detainee is brought into the jail.

Defendants assert Ms. Lane was entered on the sheet as an afterthought because Ahlers listed the time from the police report, not the actual time she came into the jail:

> Mr. Reach: So when was Fakeisha Brown entered into this traffic sheet?
>
> Plaintiff: She was entered in later on in the morning, but she was actually there at one o'clock in the morning.
>
> Mr. Reach: How do we know that?
>
> Plaintiff: We have a police report that she—or the arrest time was 00- or 00:55, straight across, which means that the officer is pulling up to the jail sometime in that vicinity of one o'clock.

(Ahlers Dep., p. 178). According to Defendants, the police report to which Ahlers is referring is the incident report filled out by Deputy Beth Gieske, the officer who brought Ms. Lane into the jail. (Wash. Co. Defendants' Ex. 8, Gieske Affidavit, p. 2). The time "0055" on the incident report Deputy Gieske's approximation of when Lane was brought into the Ypsilanti Police Department, not the Washtenaw County Jail. (*Id.*) Deputy Gieske's affidavit also indicates she finished booking Ms. Lane at 2:00 a.m., (*id.*), making it likely that Lane shared the female holding cell with Ms. Stiltner at some time near 2:00 a.m.

Defendants claim the cell roster presents similar inaccuracies and does not show the times detainees are in their cells. The cell

---

**8.** It is important to note that Lt. Clayton, in his deposition, claims to have provided Parsons with the traffic sheet and cell rosters, while Parsons claims never to have received them. Parsons brief notes the evasiveness of Clayton in his deposition, when he was unwilling to testify that actually gave Parsons the documents and only that he believed he had turned them over, but would have to review his notes to be certain.

Clayton has provided no such notes to the Court or to the other parties. Furthermore, Parsons' original notes from his meeting with the Washtenaw County Defendants do not reflect that he received those materials and they do not put forth any evidence to support the claim that they turned the material over, but instead they argue the point is moot because the evidence is not exculpatory.

roster shows who is in which cell, and is updated by handwritten entries on duty as time permits. Quite simply, it is a list of who is where. When someone is booked and put into a cell, his or her name is added to the list of persons in that cell, and when someone leaves their name is crossed off. The cell roster is used each day, spans across three shifts, and is implemented each morning at about 3:00 a.m.[9]

Plaintiffs correctly note that the cell roster shows that Lane and Michelle Germaine were in the same cell as Stiltner on August 17, 1996. Plaintiffs claim Defendants have failed to provide evidence regarding Ms. Germaine, as she could have contradicted the testimony of Ms. Lane. However, Clayton claims that only Lane was in the cell with Stiltner on August 17, and that this was the only name he passed on to Parsons. The traffic report for the midnight shift confirms that the female holding cell housed only two inmates that night, Stiltner and Lane. (Wash.Co.Defendants, Ex. 5). In short, except for the cell roster, there is no evidence that Ms. Germaine share a cell with Stiltner and Lane.

Plaintiffs also attack Parsons report, in which Lane claims she was in G block when "Carrie came over to her and was crying advising Lane that she had to give oral sex in order to get some food." But according to the Washtenaw County Defendants Exhibit 6, the cell rosters do not show Stiltner and Lane were ever housed in G block on either August 16 or 17. Plaintiffs contend that this supports their position that Stiltner's claims were baseless, and raises of jury question as to whether Defendants helped fabricate Lane's statement to cause Plaintiff's arrest. But Plaintiffs do not dispute that Lane and Stiltner were cellmates. The fact that Lane may have misspoke or did not accurately remember which cell she and Stiltner were in is not nearly as significant as Plaintiffs allege—the critical issue is not where the two were, but what occurred when they were together.

Furthermore, the Washtenaw County Defendants argue the evidentiary value of any documents produced during the midnight shift of August 17 should be discounted because such documents are notoriously replete with inaccuracies and ambiguities, and because Ahlers himself either produced the document or had access to it. For example, the cell roster has too many loose variables— it does not list when detainees are booked, housed, or released—to provide inculpatory or exculpatory evidence.

As to the allegations of potential tampering, Defendants argue that any person who wanted to cover up after committing a crime obviously has a natural interest in altering the documents to create an alibi, and Defendants argue that Ahlers' claim that the traffic sheet is important exculpatory evidence is simply a red herring because Ahlers himself created the sheet, and, thus, had both the opportunity and the motive to fill in times and information that would create his alibi. Defendants also claim that Ahlers had access to the computer system that night and could have easily manipulated the entries. Therefore, according to Defendants, an impartial investigator would have looked at the documents produced that evening as unsubstantiated, given that the suspect was responsible for producing them or at least had access to them and could have changed them to fit his needs.

This argument strikes the Court as disingenuous because the Washtenaw County Defendants are apparently criticizing the accuracy of the same documents they used to initially determine that Ahlers could have committed the crime between 12:30 a.m. and 1:00 a.m. Of course, Plaintiffs argue that this attack on the written evidence only increases the probative value of the videotape:

Again, the male videotape would have determined precisely when Lane was in front of the male booking counter being photographed and proceeded as well as which officer was involved in escorting her to her cell.

(Plaintiff's Brief, p. 27).

### (d) Quentin Evans' Computer Records

Quentin Evans is a jail detainee released after being processed by Ahlers during the

9. This process apparently includes updating the list in the computer, and printing out the updated version, which is hand-marked with updates during the ensuing shift.

night in question. Quentin Evans is listed as being released at 12:45 a.m. on August 17, 1997, which would narrow the time the alleged incident could have occurred to between 12:45 a .m. and 1:00 a.m. Defendants claim that the traffic sheet entry for Quentin Evans cannot be verified, and that Plaintiffs' attempt to narrow the timeframe is not substantiated because the document entries were not filled out in the order the detainees were processed and because the documents "are not reliable as evidence of when anything occurred." (Wash.Co.Defendants, p. 8–9). Although Defendants' argument may be correct as far as it goes, the computer records nevertheless would have some value to an investigator as to the general timing of the events that evening. Thus, Defendants' argument really goes to the weight these records would have been accorded, a decision which, of course, Parsons would have been in the best position to make.

*(e) Mendell McQueen's Computer Records*

Plaintiffs claim the records of jail detainee Mendell McQueen were not produced until the last day of Plaintiff's deposition, August 7, 1997. Plaintiffs claim these records verify the Plaintiff was processing Mr. McQueen during the time it is claimed he was committing the crime against Ms. Stiltner.

*(f) Larry Clemons' Original Statement*

According to Larry Clemons' original report, Stiltner told him on August 17, 1995 that "she gave him a blow job in the *booking area*." (Plaintiff's Ex. N)(emphasis added). The statement does not make any reference to the alleged act occurring in the holding cell or any cell. Plaintiffs claim Parsons, possibly acting in bad faith, ignored this statement and instead discussed a subsequent interview with Clemons in which he states that the act occurred in the cell.

Again, Plaintiffs characterize this seemingly harmless misstatement as an act of bad faith. When Stiltner originally told Clemons about the assault in the "booking area," perhaps she was referring to the booking area generally, which would include the holding cells. Perhaps she told Clemons the assault occurred in the cell and in his haste he characterized it in his report as the holding area. In any event, given the viability of

other explanations, this contradiction is simply not sufficient to indicate that Parsons ignored it in bad faith.

### 2. *Analysis of Undisclosed Evidence*

Having evaluated all of the undisclosed evidence, the Court cannot say that the magistrate's probable cause determination definitely would have been different if he had examined the undisclosed evidence. But, it is not Ahlers' burden to prove the proceeding would have necessarily been different, only that there is a reasonable probability that it would have been different.

In this case, if Det. Parsons and the magistrate had known of the male side video, they would no doubt have been able to account for much of Ahlers' time that night, as it would have narrowed the window of opportunity that he had to commit the assault. At the least, it must be said that the video tape evidence would likely have had a favorable tendency for Ahlers', and mitigated against a probable cause finding. Furthermore, although Defendants contend that many of the documents that on their face account for Ahlers' whereabouts at critical times are unreliable, their explanations of what actually happened—as opposed to what the documents indicate happened—really go to the weight to be given that evidence, not its sufficiency or tendency to be favorable. Therefore, the Court concludes that Plaintiffs have presented a sufficient amount of evidence to prove that Defendants failed to disclose *Brady* evidence before the magistrate's probable cause determination.

However, even giving Plaintiffs the benefit of the doubt on the value of this evidence, the question still arises as to whether this is sufficient to engender liability under § 1983. As noted above, to overcome the defense of qualified immunity and maintain a claim against a police officer for his or her investigation of a case, a plaintiff must show that an officer acted recklessly, maliciously, or intentionally to violate a clearly established federal constitutional or statutory right of which a reasonable official, in the defendant officer's position, would have known. *See, e.g., Harlow v. Fitzgerald*, 457

U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). That is, the cloak of qualified immunity shields state employees from liability so long as they acted under the "objectively reasonable" belief that what they were doing was lawful:

> This "objective reasonableness" standard focuses on whether the defendant reasonably could have thought his actions were consistent with the rights that plaintiffs claim have been violated. If the government official has acted in a manner reasonably consistent with plaintiff's rights, qualified immunity protects that official from civil suit resulting from those actions.

*Mays v. City of Dayton,* 134 F.3d 809, 813 (6th Cir.1998). *See also, Malley v. Briggs,* 475 U.S. 335, 344–45, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Ireland v. Tunis,* 113 F.3d 1435, 1448 (6th Cir.1997); *Tomer v. Gates,* 811 F.2d 1240, 1242 (9th Cir.1987).

In this case, Plaintiffs present no credible evidence of bad faith, nor is there any indication that Defendants were "out to get" Ahlers. Plaintiffs attempt to characterize the lack of completeness of the investigation and disclosure of information as being bad faith, but given the short timeframe in which the officers had to conduct the investigation, the Court cannot say that the failure to turn over the evidence was reckless or deliberate. For example, with regard to the relatively crucial male side video, the Court cannot say that the Washtenaw County officers' failure to recognize that the video could confirm the whereabouts of Mr. Ahlers was reckless. (It may have been negligent or careless, but there is nothing in the record to support a finding of recklessness, mendacity, or deliberate intent). Furthermore, they did not conceal the existence of this video from Det. Parsons, who testified in deposition that he was not particularly concerned with the male side video.

Therefore, although the Court holds that Defendants failed to turn over some Brady material before the probable cause determination, their conduct was not so egregious as to decloak them of their qualified immunity.

### 3. *Parson's probable cause finding*

Plaintiffs contend that due to Washtenaw County Defendants' alleged misconduct in failing to disclose exculpatory material, Ahlers was charged with, and arraigned on, a sexual assault crime without probable cause. Plaintiffs also claim that, based on the evidence available to Det. Parsons, he proceeded to charge Ahlers without probable cause. Washtenaw County Defendants argue that they cannot be held responsible for the probable cause determination because they handed over the investigation to the Michigan State Police, thereby giving them complete autonomy to conduct the investigation. Defendant Parsons argues there was probable cause to charge and arraign Ahlers, and, even if there was not, he is entitled to qualified immunity.

Probable cause is "the facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979). Moreover, probable cause is a mixed question of fact and law in that the circumstances underlying its determination are questions of fact, while the determination itself is a question of law. *See, e.g., United States v. Ho,* 94 F.3d 932, 935 (5th Cir.1996).[10] If the issue is whether

---

**10.** Different courts employ semantically different incarnations of this standard, all of which, as a practical matter, are substantially similar. *See, e.g., Kelly v. Serna,* 87 F.3d 1235, 1241 (11th Cir.1996)("Generally, lack of probable cause shall be a question for the jury, under the direction of the Court, [but] what facts and circumstances amount to probable cause is a pure question of law."); *Schertz v. Waupaca County,* 875 F.2d 578, 582 (7th Cir.1989)("While Section 1983 claims presenting the question of probable cause are generally inappropriate for disposition on summary judgment, this is true only where there is room for a difference of opinion."); *Whitmore v. Smith,* 1997 WL 438441 (E.D.Pa.) (quoting *Sherwood v. Mulvihill,* 113 F.3d 396, 401 (3d Cir.1997)) ("Typically, the existence of probable cause in a section 1983 action is a question of fact. The district court may conclude in the appropriate case, however, that probable cause did exist as a matter of law if the evidence,

probable cause would have existed but for a disputed fact or facts, summary judgment is inappropriate. *See, e.g., Yancey v. Carroll County,* 876 F.2d 1238, 1244 (6th Cir.1989) (material issue of fact as to whether probable cause for issuance of search warrant would have existed but for disputed statement of police officer precluded summary judgment in favor of officer in 1983 action alleging unreasonable search and seizure); *Dean v. Earle,* 866 F.Supp. 336 (W.D.Ky.1994)(in § 1983 action against police officers, alleging false imprisonment and malicious prosecution, disputes over the timing and circumstances surrounding the arrest raised material questions as to whether probable cause existed).

### (a) Underlying criminal charges

On February 13, 1996, Ahlers was charged with criminal sexual conduct in the third degree and criminal sexual conduct in the fourth degree. Under Michigan law, third degree criminal sexual conduct is when:

(1) . . . [a] person engages in sexual penetration with another person and if any of the following circumstances exists [sic]:

\*   \*   \*   \*   \*   \*

(b) Force or coercion is used to accomplish the sexual penetration . . .

(c) The actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless.

M.C.L.A. § 750.520d. Under the fourth degree provision,

(1) A person is guilty of criminal sexual conduct . . . if he or she engages in sexual contact with another person and if any of the following circumstances exist:

\*   \*   \*   \*   \*   \*

(b) Force or coercion is used to accomplish the sexual contact . . .

(c) The actor knows or has reason to know that the victim is mentally in-

viewed most favorably to Plaintiff, reasonably

capable, mentally incapacitated, or physically helpless.

\*   \*   \*   \*   \*   \*

(d) That *the other person is a prisoner . . . under the jurisdiction of a county for purposes of imprisonment . . . and the actor is an employee or contractual employee of,* or a volunteer with *the county* who knows that the other person is under the county's jurisdiction.

M.C.L.A. § 750.520e (emphasis added). It is undisputed that if Stiltner's allegations were true, the above provisions would be violated.

### (b) Facts supporting probable cause

In his deposition, Parsons describes the facts and circumstances which formed the basis for charging Ahlers with criminal sexual assault:

(1) Parsons' taped interview with Stiltner in which she accused Ahlers of sexually assaulting her;

(2) Parsons' interview with Felicia Lane in which Lane she corroborated the allegations by recounting that Stiltner came to her crying and told her that she had to give oral sex to a guard to get some food;

(3) The tape of Stiltner calling Ahlers at home, *in which he seemed indifferent that a detainee was calling him at home;*

(4) The transcript of Mays and Toth's interview with Stiltner; and

(5) The initial information Parsons received from his meeting with Ptaszek, Clayton, and Mays, including their representation that the booking documents and other related information did not account for Ahlers' whereabouts between 12:30 AM and 1:00 AM.

(Plaintiff's Ex. L, Parsons' Deposition, pp. 22–24, 40, 43–44, 46, 32–36). Moreover, Parsons prepared two reports for the Prosecutor during his investigation, a preliminary one in Fall 1995, (*Id.* at pp. 35–36), and a final one at a date not made clear in the record.

would not support a contrary factual finding.").

### (c) Probable cause determination

Plaintiffs' assert that the above facts and circumstances are insufficient to support probable cause because Stiltner is not a credible witness, due to her prior arrests and her substance abuse habits, and that to the extent they create probable cause, this showing would be substantially undercut if, with regard to the Washtenaw County Defendants' misconduct, Parsons and the Prosecutor had been provided with the video and audio tapes of the male side and had known that Stiltner was wired and that a tape of this existed.

▪ Because there was no physical evidence available, as is often the case in sexual assaults, Parsons' submitted his reports to the prosecutor based upon the alleged victim's assertion that Ahlers had sexually assaulted her. A finding of probable cause may be based on the victim's identification of the alleged perpetrator, absent a showing that the victim is unreliable. *See, e.g., United States v. Amerson,* 38 F.3d 1217, 1219 (6th Cir.1994), *cert. denied,* 514 U.S. 1056, 115 S.Ct. 1440, 131 L.Ed.2d 319 (1995); *United States v. Mahler,* 442 F.2d 1172, 1174–75 (9th Cir.), *cert. denied,* 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971).

In *Amerson,* the Sixth Circuit surveyed decisions from other circuits on this issue and adopted the approach taken by the Seven and Ninth Circuits [11]:

> The approach of the Seventh and Ninth Circuits to probable cause determinations

has been adopted in the Sixth Circuit. Thus, in *Rainer v. Lis,* [16 F.3d 1221, 1994 WL 33969] (6th Cir.1994), we found that "[a]n officer is entitled to rely on an eyewitness identification to establish probable cause. Probable cause exists unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness 'was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.' " *Rainer,* 16 F.3d at 1223 [1994 WL 33969] (citation omitted, quoting *Gerald M.,* 858 F.2d at 381). * * *

> Applying this reasoning to the instant case, we find that Sandra Martin's positive identification of the defendant was sufficient to establish probable cause for Amerson's warrantless arrest. Sandra Martin, who stood mere feet from Amerson during the United American Bank robbery, was an eyewitness to that theft. Moreover, there is nothing in the record which would indicate the police should have suspected Martin of falsification, inaccuracy or mistake with respect to her identification of Amerson.

*Amerson,* 38 F.3d at 1219.

▪ Defendants claim that Ms. Stiltner's allegations against Ahlers, by themselves, were sufficient to constitute probable cause because there has been no showing that Ms. Stiltner was unreliable regarding sexual assault violations.[12] But, it is clear that at

---

11. The Sixth Circuit identified several approaches courts have taken in finding probable cause based upon information provided by the victim:

> In *Chambers v. Maroney,* 399 U.S. 42, 46, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court found that a description of the defendant provided to the police by the victim and several observers provided "ample cause to stop a light blue compact station wagon carrying four men and to arrest the occupants." Similarly, the Seventh and Ninth Circuits have found that an eyewitness' credible identification of the defendant is sufficient in and of itself to establish probable cause. See *United States v. Mahler,* 442 F.2d 1172, 1174–75 (9th Cir.) (finding that "when the informant is the victim of the crime [it] need [not] be shown by other facts, that she is a reliable informant"), *cert. denied,* 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971); *Gerald M. v.*

> *Conneely,* 858 F.2d 378, 381 (7th Cir.1988) (finding that "[w]hen an officer has 'received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth,' he has probable cause.") (quoting *Daniels v. United States,* 393 F.2d 359, 361 (D.C.Cir. 1968) and *Gramenos v. Jewel Cos.,* 797 F.2d 432, 439 (7th Cir.1986), *cert. denied,* 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987)). *Amerson,* 38 F.3d at 1219.

12. As a matter of law, Stiltner's career choice does not bear upon her truthfulness. *See, e.g., People v. Williams,* 416 Mich. 25, 45, 330 N.W.2d 823 (1982):

> As with prior sexual conduct evidence, we see logical relation between a complainant's reputation for prostitution and the character trait of truthfulness or untruthfulness. The law should not recognize any necessary connection

some point even Parsons believed that Stiltner was not reliable. Defendants argue that Parsons decided Stiltner would not be a good witness only after Ahlers had been charged. His deposition testimony states:

Q. Didn't you make your own determination that she was not being honest?

A. At that point, no. Actually, it never came to that where I didn't feel she wasn't being honest.

*   *   *   *   *   *

Q. You conclude the discussion that you have with her on March 25, 1996, quote: While attempting to interview the victim she kept getting up and walking around. She was very unstable, kept walking around the room and was upset about being arrested on warrants. Undersigned asked her if she had been using drugs. At first she stated she had not used drugs in several months, had gotten her life back together and was not hooking anymore, then she changed her statement and said, as early as last week she had been smoking a little bit of weed and had been using a little bit. She further stated she had been drinking. At the time of her arrest she was picked up with a bottle of Jack Daniels.

That's your report; is it not?

A. Yes.

*   *   *   *   *   *

Q. From what you saw of her on March 25, 1996, she is not the kind of individual you would want to rely on for purposes of a serious allegation; is that a fair statement?

between a witness's veracity and her sexual immorality. *State ex rel. Pope v. Superior Court*, 113 Ariz. 22, 26, 545 P.2d 946, 950 (1976). We agree fully with the following observation from *Joyce*, supra, 382 Mass. 222, 415 N.E.2d 181.

"Nor is the fact that a woman engages in sex for hire relevant to the issue of her credibility. The rule is well established that the fact that a female witness is a prostitute or keeps a house of ill fame is not admissible to impeach her.' *Commonwealth v. Vandenhecke*, 248 Mass. 403, 404, 143 N.E. 337 (1924)."

13. Q. Certainly—did you learn she was a crack addict before the charges were brought against Mr. Ahlers? If you can answer that question.

A. Correct.

Q. She's a dope fiend and an alcoholic and a prostitute; right?

A. Correct.

Q. And she was a dope fiend and an alcoholic and a prostitute in August of 1995?

A. Correct.

(Plaintiff's Ex. L, Parsons' Dep., p. 61). Although Parsons admits Stiltner was a drug addict in August of 1995, he does not clearly state that he had this knowledge before bringing the charges against Ahlers. Other parts of his deposition indicate that he did not know about her drug problem before Ahlers was charged.[13] (Plaintiff's Ex. L, Parsons' Dep., p. 25–26).[14]

Plaintiffs argue that faced with this unreliable witness, a reasonable officer would have sought to corroborate and confirm her story with other evidence. Specifically, Plaintiffs argue a reasonable officer would have:

(1) interviewed Mr. Ahlers' supervisor, booking partner, and others present that night,

(2) viewed the videotape, the existence of which would have been revealed by diligent investigation, and extensive documentation which would have established the whereabouts of Ahlers,

(3) visited and reviewed the scene and determined that it would have been physically impossible for Ahlers to have entered the cell in the manner Stiltner alleged.

Plaintiffs contend that Parsons' failure to undertake this type of inquiry constitutes a reckless disregard for the truth, and possibly

A. No, I can't. Not without looking at the note.

Q. What did you learn about her prior record before Mr. Ahlers was charged?

A. That she was a prostitute and she had been arrested twice within the last couple weeks.

Q. For what?

A. For prostitution, I guess.

(Parsons Dep., p. 25).

14. Plaintiff's Exhibit X, the first page of the internal investigation conducted by the County, which Parsons presumably read, verifies that Stiltner had both misdemeanor and felony charges pending for prostitution and possession of a controlled substance.

even bad faith. Parsons admitted at the outset of his deposition that a thorough investigation includes interviewing witnesses, collecting evidence, photographing the scene, collecting any tangible evidence that might exist to corroborate a witness' versions of what happened, and preserving evidence. (Parsons Dep., p. 7–8). Parsons admitted that he did not conduct a thorough investigation in this case involving serious allegations.

But, the mere fact that Parsons did not conduct a thorough investigation, does not itself mean that he violated Ahlers' constitutional rights. In the analogous case of *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir.1995), the plaintiff brought a § 1983 action against police officers, arguing they did not have probable cause to arrest him (without a warrant) based on the statements of two witnesses. The plaintiff failed to show that the two statements did not constitute reasonably trustworthy information sufficient to lead a prudent police officer to conclude that the plaintiff commit the murder in question. *Id.* at 1476. Nonetheless, the plaintiff argued that a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest. *Id.* at 1476.

The court rejected this argument, stating that the Fourth Amendment requires officers "to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest or detention." *Id.* at 1476–77. The court also rejected the plaintiff's argument that the officers' failure to contact his alibi witness amounted to a per se violation of the Fourth Amendment. This is so because once an officer has enough evidence to constitute probable cause, he or she has no continuing obligation to further investigate in an attempt to uncover exculpatory evidence. As the court stated: "Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witness prior to arrest did not negate probable cause." *Id.* at 1477–1478.

*See also, Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir.1988)("A policeman ... is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forgo arrest pending further investigation if the facts as initially discovered provide probable cause."); *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir.1989)("In fact, it appears that once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence.")(citing *Baker v. McCollan*, 443 U.S. 137, 145–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)("Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence.")); *Kompare v. Stein*, 801 F.2d 883, 890 (7th Cir.1986)("the law appears to be ... that the police ... have no constitutional duty to keep investigating a crime once they have established probable cause.").

In *Whitmore v. Smith*, 1997 WL 438441 (E.D.Pa.), the court ruled that a police officer's failure to perform a thorough investigation before making a probable cause determination did not constitute a constitutional violation. In that case, Earl Whitmore was arrested for sexually assaulting two children. In his suit against the officers, he claimed they had performed a substandard investigation by failing to interview him to determine if he had an alibi for the times in question, not tape recording the interviews of the children, not investigating whether the children could have been sexually assaulted by their family members, and failing to corroborate the statements of two young children. The court noted that the shortcomings were not as egregious as the plaintiff claimed, and stated that the officer is not required to conduct a "mini-trial" before arresting a defendant. *Id.* at *8 (citing *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir.1996)). The court stated:

> [T]he issue is not whether the information on which police officers based their request for an arrest warrant resulted from a pro-

fessionally executed investigation; rather, the issue is whether that information would warrant a reasonable person to believe that an offense has been committed by the person to be arrested. *Whitmore*, 1997 WL 438441 at *8 (citing *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir.1995)). Based on that standard, the court concluded that the officer has probable cause to arrest the plaintiff at the time he applied for the warrants.

■■■■ Ultimately, then, given the lack of duty to continue investigating after probable cause has been found, the Court here cannot find Defendant Parsons liable for finding probable cause and charging Ahlers. Parsons relied on Stiltner's statement, and although she may not have been the most reliable complainant, her story was corroborated by Ms. Lane and, to a certain extent, by the Washtenaw County Defendants' assertion that they could not account for Ahlers' whereabouts between 12:30 a.m. and 1:00 p.m. In the Court's view, this was enough to give Parsons probable cause to charge Ahlers, at which point he had no duty to continue his investigation to determine if exculpatory evidence existed. That Parsons' investigation was less than a model of thoroughness—or even fairness to Ahlers—does not negate his basis for initially finding probable cause. Although one would hope that officers would conduct a thorough and professional investigation before proceeding to charge a suspect, so long as an officer has established probable cause for the charge, absent an element of malice or mendacity, he will not be found liable for false arrest for lack of probable cause simply because subsequent investigation reveals exculpatory information which the officer could have found had his investigation been more complete.

Although this standard may seem harsh from the perspective of one who is wrongfully arrested, it is well grounded in policy and the real-world life of investigating officers. Often, officers must make arrest decisions based upon information that is incomplete and still developing. To subject officers to liability for wrong decisions—or for not conducting a thorough investigation—would chill investigative work and, no doubt, result in guilty parties being allowed to flee or intimidate witnesses. Thus, once the officer has probable cause, courts should not second-guess the officer simply because other exculpatory evidence was also available, unless it can be shown that the officer discovered the evidence and somehow, acting with malice or mendacity, concealed or altered it.

■■■■ Furthermore, it is important to remember that Parsons' decision to charge Ahlers was ratified when a prosecutor presented the case to a neutral magistrate, who ultimately issued the warrant. In such circumstances, a police officer can only be held liable if he "stated a deliberate falsehood or acted with a reckless disregard for the truth. Proof of negligence or innocent mistake is insufficient." *Lippay v. Christos*, 996 F.2d 1490, 1500–01 (3d Cir.1993) (citing *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). *See also, Doherty v. Haverkamp*, 1997 WL 297072, *5 (E.D.Pa.)) ("Nevertheless, if the warrant was obtained with knowledge of the falsity of the underlying facts which establish probable cause, or with reckless disregard for the truth of such facts, arrest pursuant thereto may constitute a Fourth Amendment violation."). Under these facts, the Court cannot say, despite the investigation's shortcomings, that Parsons acted with a reckless disregard for the truth.

As to the Washtenaw County Defendants, the Court cannot hold them liable for the probable cause determination made by Parsons, the prosecutor, and the magistrate. The only liability they have regarding the probable cause determination, as admitted by Plaintiffs, would stem from their failure to turn over exculpatory evidence that might have affected the probable cause determination, and that issue has been addressed in the previous section of this opinion.

## VI. *CONCLUSION*

Therefore, as to the Washtenaw County Defendants, the Court rules that their failure to turn over the exculpatory evidence to Parsons was not objectively unreasonable given the brevity of their investigation and the absence of evidence indicating bad faith. As

to Defendant Parsons, the Court rules that his investigation, while certainly not flawless, and the evidence garnered therefrom were sufficient for him to present the evidence to the prosecutor and magistrate to make a determination as to whether probable cause existed.

Therefore, because no genuine issue of material fact exists in this case, Defendants Motion for Summary Judgment is GRANTED, and the case is DISMISSED WITH PREJUDICE.